**STATE OF MINNESOTA**                          **DISTRICT COURT**

**COUNTY OF DAKOTA**                        **FIRST JUDICIAL DISTRICT**

---

Patrick Finn and Lighthouse Management                 Court File No._____
Group, Inc., as Receiver for First United
Funding, LLC, and Corey N. Johnston,

                   Plaintiff,

                                                       **SUMMONS**

v.

Jerry C. Moyes, individually and as Trustee of
The Jerry and Vickie Moyes Family Trust,
Vickie L. Moyes, individually and as Trustee
of The Jerry and Vickie Moyes Family Trust,
The Jerry And Vickie Moyes Family Trust,
and Moyes Children's Limited Partnership.

                   Defendants.

---

**THIS SUMMONS IS DIRECTED TO:** Moyes Children's Limited Partnership

**1.     YOU ARE BEING SUED**. The Plaintiff has started a lawsuit against you. The
Plaintiff's Complaint against you is attached to this Summons. Do not throw these
papers away. They are official papers that affect your rights. You must respond to this
lawsuit even though it may not yet be filed with the Court and there may be no court file
number on this Summons.

**2.     YOU MUST REPLY WITHIN 20 DAYS TO PROTECT YOUR RIGHTS**.
You must give or mail to the person who signed this Summons a written response called
an Answer within 20 days of the date on which you received this Summons. You must
send a copy of your Answer to the person who signed this Summons located at:

        Ryan T. Murphy
        Gregory E. Karpenko
        Joseph J. Cassioppi
        Fredrikson & Byron, P.A.
        200 South Sixth Street

EXHIBIT A

Suite 4000
Minneapolis, Minnesota 55402

**3.     YOU MUST RESPOND TO EACH CLAIM.**  The Answer is your written response to the Plaintiff's Complaint.  In your Answer you must state whether you agree or disagree with each paragraph of the Complaint.  If you believe the Plaintiff should not be given everything asked for in the Complaint, you must say so in your Answer.

**4.     YOU WILL LOSE YOUR CASE IF YOU DO NOT SEND A WRITTEN RESPONSE TO THE COMPLAINT TO THE PERSON WHO SIGNED THIS SUMMONS.**  If you do not answer within 20 days, you will lose this case.  You will not get to tell your side of the story, and the Court may decide against you and award the Plaintiff everything asked for in the Complaint.  If you do not want to contest the claims stated in the Complaint, you do not need to respond.  A default judgment can then be entered against you for the relief requested in the Complaint.

**5.     LEGAL ASSISTANCE.**  You may wish to get legal help from a lawyer.  If you do not have a lawyer, the Court Administrator may have information about places where you can get legal assistance.  **Even if you cannot get legal help, you must still provide a written Answer to protect your rights or you may lose the case.**

**6.     ALTERNATIVE DISPUTE RESOLUTION.**  The parties may agree to or be ordered to participate in an alternative dispute resolution process under Rule 114 of the Minnesota General Rules of Practice.  You must still send your written response to the Complaint even if you expect to use alternative means of resolving this dispute.

Dated: April 7, 2014

/s/ Ryan T. Murphy
Ryan T. Murphy (#311972)
Gregory E. Karpenko (#286473)
Joseph J. Cassioppi (#388238)
FREDRIKSON & BYRON, P.A.
4000 U.S. Bank Plaza
200 South Sixth Street
Minneapolis, MN  55402
Telephone:   612/492-7000
FAX:           612/492-7077
rmurphy@fredlaw.com
kgarpenko@fredlaw.com
jcassioppi@fredlaw.com

**ATTORNEYS FOR PLAINTIFF**

49504496

2

**STATE OF MINNESOTA**

**COUNTY OF DAKOTA**

**DISTRICT COURT**

**FIRST JUDICIAL DISTRICT**

---

Patrick Finn and Lighthouse Management
Group, Inc., as Receiver for First United
Funding, LLC, and Corey N. Johnston,

    Plaintiff,

v.

Jerry C. Moyes, individually and as Trustee of
The Jerry and Vickie Moyes Family Trust,
Vickie L. Moyes, individually and as Trustee
of The Jerry and Vickie Moyes Family Trust,
The Jerry And Vickie Moyes Family Trust,
and Moyes Children's Limited Partnership.

    Defendants.

Court File No._____

**COMPLAINT**

---

  For its Complaint against Defendants Jerry C. Moyes, Vickie L. Moyes, The Jerry

and Vickie Moyes Family Trust, and Moyes Children's Limited Partnership (collectively

referred to as the "Defendants"), Plaintiff Patrick Finn and Lighthouse Management

Group, Inc. ("Receiver"), as "Receiver" for First United Funding, LLC ("First United")

and Corey N. Johnston ("Johnston"), states and alleges as follows:

## INTRODUCTION

  1. The United States Attorney's Office charged Johnston with operating an

"$80 million Ponzi scheme" through his company, First United. Johnston pleaded guilty.

As part of that plea, Johnston admitted to "knowingly and intentionally" engaging in a

fraudulent scheme to defraud banks involving the sale of participations in "large commercial and personal loans." Johnston admitted that he did not disclose the fraudulent scheme to the banks with whom First United was dealing and that he knew it was impossible for the banks to receive full repayment. Johnston also admitted he utilized the proceeds of the fraud to "perpetuate the scheme" and to support his lavish lifestyle. The claims of the victims exceeded $135 million. Johnston is currently serving his prison sentence in the federal penitentiary in Duluth, Minnesota.

2.      By orders of the Dakota County District Court of the State of Minnesota, Patrick Finn and Lighthouse Management Group, Inc. were appointed as Receiver of, and authorized to exercise control over, First United and the non-exempt assets of Johnston. Among other things, the Court authorized the Receiver to "[i]nvestigate and pursue any and all claims that First United or the Receiver may have against any third party . . . ."

3.      The Defendants and other entities owned or controlled by Jerry Moyes (the "Moyes Parties") were First United's primary borrowers. Of the $703 million in loans made by First United from the Ponzi scheme, more than $642 million were made to the Moyes Parties—over 90% of all loans made by First United. Almost all of the remaining 10% were made to persons that the Moyes Parties introduced to Johnston, including entities owned or controlled by the Moyes Parties' counsel.

4.      At the time of the Receiver's appointment, over $70 million in loans to the Moyes Parties and other entities in which they held an interest were in default and Johnston had taken no action to collect the outstanding amounts. The Receiver has since collected approximately $62 million of these loans. During this process, counsel for the

2

Moyes Parties described Johnston as "Minnesota's Madoff" and "Corey the Forger," and First United as a "Forging Factory." Counsel for the Moyes Parties asserted that the victims of the scheme "are in this position not due to Jerry Moyes, but due to Corey the Forger, and frankly, their own stupidity in relying upon Corey and not doing independent due diligence."

5.    The Receiver's investigation has revealed otherwise—the Defendants had actual knowledge of, and aided and abetted Johnston's Ponzi scheme, including Johnston's sale of participations in counterfeit and oversold loans. Without Defendants' substantial assistance, the Ponzi scheme would not have ensnared victims from 2002 to 2009, and would not have caused the staggering losses it inflicted on the participant banks left holding the bag when the Ponzi scheme collapsed.

6.    From the beginning of the Ponzi scheme in 2002, Johnston and Defendants represented to the banks participating in the Ponzi scheme that over $367 million in loans made by First United to the Moyes Parties were properly collateralized by stock owned by the Defendants and held in collateral accounts at certain financial institutions. These representations were central to perpetrating the Ponzi scheme because they led banks to believe that the loans they were participating in were secured. These representations were false. Many of the loans were not secured by stock at all. Others were "secured" by accounts that had been over-pledged by the Moyes Parties to secure multiple loans. At one point in time, the Defendants had over-pledged a single account by $136 million in furtherance of the Ponzi scheme.

3

7.      Moreover, the Defendants, in particular Jerry and Vickie Moyes, were notified by Oppenheimer & Co., Inc. ("Oppenheimer"), one of the financial institutions allegedly holding security accounts on behalf of First United, that Oppenheimer had no knowledge of the purported security interests.  Rather than cease doing business with Johnston or notify the participant banks of Johnston and First United's fraudulent conduct, the Defendants aided and abetted Johnston's Ponzi scheme by threatening legal action against Oppenheimer in an attempt to thwart a wider investigation into First United's activities, moving the collateral accounts to another financial institution, and continuing the same fraudulent conduct, including over-pledging securities in concert with Johnston.

8.      In exchange for Defendants' aiding and abetting the Ponzi scheme, the Moyes Parties obtained hundreds of millions of dollars in private loans, some of which were not repaid until appointment of the Receiver, and some of which were not repaid at all.  Additionally, the Moyes Parties received additional transfers and value, including a transfer of over $2.7 million to Jerry Moyes individually.

9.      The Receiver has commenced this action against the Defendants to recover funds to compensate, at least in part, the victims of Johnston's Ponzi scheme.

## PARTIES

10.     First United is a Minnesota limited liability company that operated out of a garage behind Johnston's house in Lakeville, Minnesota.  First United was formed on February 7, 2002 as Fahnestock Funding, LLC and later changed its name to First United Funding, LLC.  First United is now under the control of the Receiver.

4

11.    Johnston is a Minnesota resident.  At all relevant times, Johnston controlled First United.  The Receiver now has control of all of Johnston's non-exempt assets.

12.    Patrick Finn and Lighthouse Management Group, Inc. are Minnesota citizens and the duly-appointed "Receiver" for First United and Johnston pursuant to the Minnesota State Court's Orders dated October 23, 2009, December 3, 2009, and February 5, 2010.  The Receiver has standing to assert claims against Defendants under the Court's Orders, under Minnesota statutes and common law, and as representative and assignee of the creditors of First United and Johnston.  Creditors holding the majority of damage claims have executed documents assigning to the Receiver their claims, including against third parties.

13.    Upon information and belief, Defendants Jerry C. Moyes ("Jerry Moyes") and Vickie L. Moyes ("Vickie Moyes") are husband and wife and reside at 13327 N. 65th Dr., Glendale, AZ, 85304-1005, and who, at all relevant times herein, acted on behalf of themselves for their own interests as a well as for the marital community.

14.    Upon information and belief, Defendant The Jerry And Vickie Moyes Family Trust is a trust under Arizona law and is located at 2710 E. Old Tower Road, Phoenix, AZ 85034.  Upon information and belief, the trustees of The Jerry and Vickie Moyes Family Trust are Jerry and Vickie Moyes.

15.    Upon information and belief, Defendant Moyes Children's Limited Partnership is a limited partnership under Arizona law and is located at 2200 South 75th Avenue, Phoenix, AZ 85043.  Upon information and belief, all general and limited partners of Moyes Children's Limited Partnership are citizens of Arizona.

5

## VENUE AND JURISDICTION

16.     The Defendants are subject to personal jurisdiction in Minnesota and venue

is proper in this court because: (i) a substantial part of the events giving rise to the claims

occurred in Dakota County, Minnesota; (ii) all of the Defendants purposefully availed

themselves of the privilege of conducting activities within Minnesota by entering into

agreements and engaging in transactions with Johnston, a Minnesota resident, and First

United, a Minnesota entity (including signing more than one hundred notes payable in

"Minnesota" and engaging in thousands of transfers of funds to First United's Minnesota

bank account totaling over $1.7 billion over more than seven years), and, in doing so,

invoked the benefits and protections of the Minnesota's law; and (iii) the Defendants

have consented to venue and jurisdiction in Minnesota, waived any argument that such

venue is not convenient, and acknowledged that Minnesota law governs in more than one

hundred agreements with First United and the Receiver.

## THE COURT APPOINTS A RECEIVER

17.     In September 2009, two banks commenced litigation in Minnesota State

Court over participations sold by First United.  As part of their lawsuit, these banks asked

the Minnesota State Court to appoint a receiver for First United.

18.     On October 23, 2009, Judge Kathryn D. Messerich of the Dakota County

District Court of the State of Minnesota appointed Plaintiff as Receiver for First United.

The District Court found that First United had oversold participations associated with

various banks.  A copy of the October 23, 2009 order is attached as **Exhibit A**.

6

19.     On December 3, 2009, at the request of one of the defrauded banks, Judge Thomas Poch of the Dakota County District Court expanded the role of the Receiver to include Johnston's non-exempt assets.  Specifically, the Court authorized the Receiver to, among other things, seize non-exempt property from Johnston, and to seize business records associated with First United and any interest that Johnston had in any business entity.  A copy of the December 3, 2009 order is attached as **Exhibit B**.

20.     On February 5, 2010, Judge Joseph T. Carter of the Dakota County District Court entered an order expanding the Receiver's authority.  Judge Carter's February 5, 2010 Order specifically authorized the Receiver to, among other things, "[i]nvestigate and pursue any and all claims that First United or the Receiver may have against any third party . . . ."  A copy of the February 5, 2010 order is attached as **Exhibit C**.

21.     After the Receiver was appointed, the Receiver undertook a diligent inquiry into the nature and extent of Johnston's fraudulent scheme and the involvement of the Defendants.  The Receiver could not have discovered Johnston's actions, or the aiding and abetting of the fraud by the Defendants, until a reasonable period after its appointment by the Court.  In addition, the Receiver could not have discovered that Jerry Moyes received an over $2.7 million fraudulent transfer until the Receiver obtained certain records in September 2013.

## THE PONZI SCHEME

22.     Johnston and First United's business ostensibly involved selling participation interests or assignments in loans made by First United.  First United loaned

7

or purported to loan funds to borrowers in exchange for promissory notes and collateral, principally stock that was purportedly pledged by the Defendants.

23.     The promissory notes and related loan documents were between the borrower and First United.   First United then entered into agreements with banks (the "Participants"), whereby one or more Participants purchased or acquired an interest in a purported promissory note between First United and the borrower.

24.     The Moyes Parties knew that First United did not have sufficient assets to make the loans and had to sell participations to fund the loans.

25.     In reality, Johnston and First United operated a Ponzi scheme to defraud Participants.

26.     On August 6, 2010, the United States Attorney's Office charged Johnston "with operating an $80 million Ponzi scheme with bank money." A copy of the report is attached as **Exhibit D**.

27.     Johnston pleaded guilty.   As part of that plea, Johnston admitted to "knowingly and intentionally" engaging in a fraudulent scheme to defraud Participants involving "large commercial and personal loans."  Johnston utilized the proceeds of the fraud to "perpetuate the scheme" and to support his lavish lifestyle—a classic Ponzi scheme.  Johnston admitted that because of his fraud, he knew it was impossible for the Participants to receive full repayment.   A copy of Johnston's Plea Agreement and Sentencing Stipulations is attached as **Exhibit E**.

8

28.    After Johnston's guilty plea, the United States Attorney issued a report stating Johnston had pleaded "guilty to operating an $80 million Ponzi scheme with bank money." A copy of the report is attached as **Exhibit F**.

29.    Johnston was sentenced to prison and remains incarcerated in the federal penitentiary located in Duluth, Minnesota.

30.    Beginning by at least 2002, Johnston and First United operated a Ponzi scheme that involved fraudulently selling participations or other interests in loans to Participants.

31.    Johnston employed a number of devices to conduct the Ponzi scheme involving approximately $703 million in loans and $773 million in participations.   The devices included, but were not limited to:

   (a)    Funding all, or substantially all, of the approximately $703 million in loans made by First United with stolen and commingled funds;

   (b)    $367 million in loans to the Moyes Parties purportedly secured by Swift Transportation stock pledged by the Defendants, with $406 million in participations (including "counterfeit" and "oversold" participations);

   (c)    $104 million of participations in "counterfeit loans"—loans First United did not actually make to the purported borrowers;

   (d)    $258 million of "oversold participations"—participations sold that exceeded the amount First United loaned to borrowers by over $126 million;

9

(e)     $44 million of participations in "underfunded loans"—where the promissory note amounts signed by the borrower exceeded the amount First United funded to the borrower by approximately $15 million;

(f)     $113 million of "no participant" loans—loans that could not have been made but for the scheme; and

(g)     $33 million of "under participated" loans—where participations sold were less than the amount First United advanced to the borrower, which again could not have been done but for the scheme.

32.     First United also funded payments to Participants in other seemingly legitimate participations or assignments with stolen and commingled funds, often making transfers to Participants where the borrowers did not make transfers to First United.

33.     To facilitate the transfer of funds, Johnston and First United utilized a series of bank accounts that contained stolen and commingled funds. Since 2002, First United engaged in over 17,000 transactions totaling over $4 billion. The vast majority of these transactions, including thousands of transactions totaling over $1.7 billion between First United and the Moyes Parties, occurred in First United's Wells Fargo checking account, which was located in Minneapolis, Minnesota. First United maintained no system to track the over $4 billion in transactions.

## First United Was Insolvent From 2002 To 2009

34.     By virtue of how they operate, Ponzi schemes are by definition insolvent from their inception – meaning they generate more liabilities than assets. Johnston and First United's Ponzi scheme was no exception.

10

35.     First United was insolvent each year from 2002 to 2009. First United's liabilities exceeded its assets each year from 2002 to 2009. First United was also insolvent each year from 2002 to 2009 because it could not pay its debts without funds fraudulent obtained from Participants.

36.     First United's cumulative cash shortfall without the funds it fraudulently obtained through only counterfeit and excess participations (and excluding other fraudulent devices identified above) was substantial. The cumulative shortfall for each year from 2002 through 2009 was: (a) approximately $1.6 million in 2002; (b) approximately $30 million in 2003; (c) approximately $34 million in 2004; (d) approximately $43 million in 2005; (e) approximately $49 million in 2006; (f) approximately $51 million in 2007; (g) approximately $51 million in 2008; and (h) approximately $52 million in 2009.

## THE VICTIMS OF THE PONZI SCHEME

37.     On November 17, 2011, the Dakota County District Court issued an Order Accepting the Receiver's Calculation of Claims, Order for Judgment, and Memorandum and Judgment. The Order approved the Receiver's calculation of the creditor claims of the victims of the fraud, which totaled $91,193,042. An identical calculation of creditor claims was adopted by the United States District Court for the District of Minnesota in its Order for restitution to be made by Johnston, which is attached as **Exhibit G**.

38.     Under both Orders, the victim claims were calculated based on the netting rule—the difference between the victims' payments to First United and the payments they received from First United. The victim claims based on a "principal and interest"

11

method totaled at least $136,716,099 as of the date of the Receiver's appointment on October 23, 2009. The outstanding amount of the victim's claims exceeds $58 million.

39. The victims of the Ponzi scheme include financial institutions (the "Victim Participants") that were defrauded by Johnston and First United as part of the Ponzi scheme.

### Bank Forward

40. Bank Forward is a North Dakota banking corporation with its principal place of business in Grand Forks, North Dakota. Bank Forward entered into at least 3 participations with First United, all of which involved loans, or purported loans, to the Moyes Parties. First United defrauded Bank Forward in connection with every participation, including by representing that First United was a legitimate and solvent enterprise and by depositing funds received from Bank Forward, or borrower payments that should have been transferred to Bank Forward, into First United's commingled accounts and using those funds to make payments to other Participants and to otherwise perpetuate the Ponzi scheme.

41. Bank Forward's participations with First United included: (1) a $1.5 million participation dated December 27, 2007 in a $2.5 million loan to CB Ranch South LLC—First United sold a total of $11.5 million in participations in the $2.5 million loan; and (2) a total of $2 million in participations pursuant to participations dated December 31, 2007 and January 24, 2008 in a $7 million loan to Whiteout Way Investments, LLC— First United sold a total of $23.65 million in participations in the $7 million loan.

12

42.   Based on the losses it suffered at the collapse of the Ponzi scheme, Bank Forward's court-approved claim against Johnston and First United is $2,935,138 under the net-investment method.  Bank Forward had a claim against First United and Johnston of $3,033,943 as of the appointment of the Receiver under the principal and interest method.

## Border State Bank

43.   Border State Bank ("BSB") is a Minnesota banking corporation with its principal place of business in Greenbush, Minnesota.  BSB entered into at least 5 participations with First United, all of which involved loans, or purported loans, to the Moyes Parties.  First United defrauded BSB in connection with every participation, including by representing that First United was a legitimate and solvent enterprise and by depositing funds received from BSB, or borrower payments that should have been transferred to BSB, into First United's commingled accounts and using those funds to make payments to other Participants and to otherwise perpetuate the Ponzi scheme.

44.   BSB's participations with First United included: (1) a $1 million participation dated March 12, 2003 in a counterfeit loan First United falsely represented that it was making to Jerry and Vickie Moyes; (2) a total of $1.7 million in participations pursuant to participations dated July 22, 2004 and October 20, 2005 in an underfunded $5 million loan to Jerry and Vicki Moyes—First United sold a total of $3.85 million in participations in the purported $5 million loan, but funded only $2.7 million to the borrowers; (3) a $1 million participation dated April 3, 2006 in a $3.5 million loan to Yavapai Land Holdings—prior to entering into the participation with BSB, First United

13

had already sold $4.5 million in participations in the $3.5 million loan; and (4) a $2 million participation dated May 10, 2007 in a $14,153,750 loan to McClellan Ranch Investments, LLC—First United sold a total of $18,653,750 in participations in the $14,153,750 loan.

45.     Based on the losses it suffered at the collapse of the Ponzi scheme, BSB's court-approved claim against Johnston and First United is $1,315,216 under the net-investment method.  BSB had a claim against First United and Johnston of $2 million as of the appointment of the Receiver under the principal and interest method.

### Charter Bank

46.     Charter Bank ("Charter") is a Wisconsin banking corporation with its principal place of business in Eau Claire, Wisconsin.  Charter entered into at least 8 participations with First United, 6 of which involved loans, or purported loans, to the Moyes Parties.  First United defrauded Charter in connection with every participation, including by representing that First United was a legitimate and solvent enterprise and by depositing funds received from Charter, or borrower payments that should have been transferred to Charter, into First United's commingled accounts and using those funds to make payments to other Participants and to otherwise perpetuate the Ponzi scheme.

47.     Charter's participations with First United included: (1) a $3.06 million participation dated March 28, 2002 in a $3.06 million loan to Steve Ellman; (2) a $300,000 participation dated March 28, 2002 in a $3.16 million loan to Steve Ellman; (3) a $2.5 million participation dated September 20, 2002 in an underfunded $3.15 million loan to JM Investment Properties, LLC; (4) a $3.41 million participation dated January 7,

14

2003 in a counterfeit loan First United falsely represented that it was making to Jerry and Vickie Moyes; (5) a $2 million participation dated April 8, 2005 in a counterfeit loan First United fraudulent represented it was making to Moyes Children's Limited Partnership—First United sold a total of $6 million in participations in the counterfeit loan; (6) a $2 million participation dated June 26, 2007 in an $8 million loan to JM Land Development II, LLC—First United sold a total of $49 million in participations in the $8 million loan; (7) a $2 million participation dated June 27, 2007 in a $14,153,750 loan to McClellan Ranch Investment, LLC—First United sold a total of $18,653,750 in participations in the $14,153,750 loan; and (8) a $2 million participation dated June 27, 2007 in a $16.65 million loan to Yavapai Land Holdings—First United sold a total of $18.65 million in participations in the $16.65 million loan.

48.     Based on the losses it suffered at the collapse of the Ponzi scheme, Charter's court-approved claim against Johnston and First United is $4,431,954 under the net-investment method.    Charter had a claim against First United and Johnston of $8,483,726 as of the appointment of the Receiver under the principal and interest method.

### Choice Financial Group

49.     Choice Financial Group ("Choice") is a North Dakota banking corporation with its principal place of business located in Grafton, North Dakota. Choice entered into at least 15 participations with First United, of which 13 involved loans, or purported loans, to the Moyes Parties.  First United defrauded Choice in connection with every participation, including by representing that First United was a legitimate and solvent enterprise and by depositing funds received from Choice, or borrower payments that

15

should have been transferred to Choice, into First United's commingled accounts and using those funds to make payments to other Participants and to otherwise perpetuate the Ponzi scheme.

50.     Choice's participations with First United included: (1) a $3 million participation dated February 10, 2003 in a counterfeit loan First United falsely represented that it was making to Jerry and Vickie Moyes; (2) a total of $5 million in participations pursuant to two participation dated March 14, 2003 and March 11, 2004 in an underfunded loan to Jerry and Vickie Moyes—the promissory note First United provided to Choice falsely represented that the loan was for $5 million, the note signed by Jerry and Vickie Moyes was for $4 million, and only $3 million was actually funded to the Moyes; (3) a total of $5 million in participations pursuant to two participations dated March 10, 2004 and March 11, 2004 in a counterfeit loan First United falsely represented it was making to Jerry and Vickie Moyes; (4) a $5 million participation dated March 25, 2004 in a counterfeit loan First United falsely represented it was making to Moyes Children's Limited Partnership—First United sold a total of $10.5 million in participations in this counterfeit loan; (5) a total of $8 million in participations pursuant to participations dated May 16, 2007 and May 24, 2007 in an $8 million loan to JM Land Development II, LLC—First United sold a total of $49 million in participations in the $8 million loan; (6) a $3.25 million participation dated June 15, 2006 in a $3.25 million loan to Jerry and Vickie Moyes—First United sold a total of $11.6 million in participations in the $3.25 million loan; (7) a $1,351,612 participation dated January 26, 2007 in a $1,351,612 loan to McClellan Ranch Investments, LLC; (8) a $5 million participation

16

dated May 16, 2007 in a counterfeit loan First United falsely represented it was making to
Jerry and Vickie Moyes; (9) a $6.65 million participation dated September 5, 2007 in a
$6.65 million loan to Naupaka Investments, LLC—prior to entering into the participation
with Choice, First United had already sold $13.65 million in participations in the $6.65
million loan; (10) a $1,575,000 participation dated May 29, 2008 in a $4,837,500 loan to
Jerry and Vickie Moyes—First United sold a total of $6,412,500 in participations in the
$4,837,500 loan; (11) a $1.33 million participation dated June 17, 2008 in a $1.33 million
loan to Shumway Four Corners Development, LLC; and (12) a $5 participation on or
about December 15, 2008 in a $5 million loan to Jerry and Vickie Moyes.

51.     Based on the losses it suffered at the collapse of the Ponzi scheme,
Choice's court-approved claim against Johnston and First United is $17,092,814 under
the net-investment method.  Choice had a claim against First United and Johnston of
$23,987,557 as of the appointment of the Receiver under the principal and interest
method.

## The Columbian Bank and Trust Company

52.     The Columbian Bank and Trust Company ("Columbian") was a Kansas
banking corporation with its principal place of business in Topeka, Kansas.  Columbian
entered into at least 12 participations with First United, of which 8 involved loans, or
purported loans, to the Moyes Parties.  First United defrauded Columbian in connection
with every participation, including by representing that First United was a legitimate and
solvent enterprise and by depositing funds received from Columbian, or borrower
payments that should have been transferred to Columbian, into First United's

17

commingled accounts and using those funds to make payments to other Participants and to otherwise perpetuate the Ponzi scheme.

53.     Columbian's participations with First United included: (1) a $7 million participation dated May 13, 2004 in a $7 million loan to Jerry and Vickie Moyes; (2) a $7 million participation dated July 29, 2004 in a $7 million loan to Moyes Children's Limited Partnership; (3) a $1 million participation dated October 6, 2005 in a $3.5 million loan to Yavapai Land Holdings—First United sold a total of $5.5 million in participations in in the $3.5 million loan; (4) a $3.25 million participation dated July 7, 2006 in a $3.25 million loan to Jerry and Vickie Moyes—First United sold a total of $11.6 million in participations in the $3.25 loan; (5) a $1.5 million participation dated August 8, 2006 in a $10 million loan to Greenline Properties, LLC—prior to entering into the participation with Columbian, First United had already sold $11 million in participations in the $10 million loan; (6) a $3 million participation dated September 14, 2006 in a counterfeit loan First United fraudulently represented that it was making to Moyes Children's Limited Partnership—First United sold a total of $6 million in participations in the counterfeit loan; (7) a $3.7 million participation dated December 15, 2006 in a $3.7 million loan to Cave Creek Management Group, LLC; (8) a $13,875,000 participation dated January 26, 2007 in a $13,875,000 loan to Wesdon Financial / MPB Holdings—First United sold a total of $14,875,000 in participations in the $13,875,000 loan; (9) an $8 million participation dated July 10, 2007 in an $8 million loan to JM Land Development II, LLC—First United sold a total of $49 million in participations in the $8 million loan; (10) a $1.5 million participation dated July 28, 2007 in an $8.3 million loan

18

to Wesdon Financial / MPB Holdings; (11) a $6 million participation dated August 28, 2007 in a $6.65 million loan to Naupaka Investments, LLC—First United sold a total of $20.3 million in participations in the $6.65 million loan; and (12) a $2.5 million participation dated December 7, 2007 in a $2.5 million loan—First United sold a total of $11.5 million in participations in the $2.5 million loan.

54.     Based on the losses suffered at the collapse of the Ponzi scheme, the court-approved claims of Columbian's successors-in-interest total $16,056,918 under the net-investment method.  Columbian's successors-in-interest had a claim against First United and Johnston totaling $25,634,758 as of the appointment of the Receiver under the principal and interest method.

## Community Financial Bank

55.     Community Financial Bank is a Wisconsin banking corporation with its principal place of business in Prentice, Wisconsin.  Community Financial, and its predecessor-in-interest, Community State Bank of Prentice (collectively, "Community Financial") entered into at least 3 participations with First United, all of which involved loans, or purported loans, to the Moyes Parties.  First United defrauded Community Financial in connection with every participation, including by representing that First United was a legitimate and solvent enterprise and by depositing funds received from Community Financial, or borrower payments that should have been transferred to Community Financial, into First United's commingled accounts and using those funds to make payments to other Participants and to otherwise perpetuate the Ponzi scheme.

19

56.     Community Financial's participations with First United included: (1) a $500,000 participation dated November 15, 2002 in a $750,000 loan to Jerry and Vickie Moyes; (2) a $500,000 participation dated September 22, 2003 in a $5 million loan to Moyes Children's Limited Partnership—First United sold a total of $6.75 million in participations in the $5 million loan; (3) a $400,000 participation dated March 26, 2008 in a $2,875,000 loan to JM Land Development II, LLC—First United sold a total of $3,275,000 in participations in the $2,875,000 loan.

57.     Based on the losses it suffered at the collapse of the Ponzi scheme, Community Financial's court-approved claim against Johnston and First United is $421,012 under the net-investment method.  Community Financial had a claim against First United and Johnston of $925,692 as of the appointment of the Receiver under the principal and interest method.

### Community First Bank

58.     Community First Bank ("Community First") is a Wisconsin banking corporation with its principal place of business in Boscobel, Wisconsin.  Community First entered into at least 9 participations with First United, 6 of which involved loans, or purported loans, to the Moyes Parties.  First United defrauded Community First in connection with every participation, including by representing that First United was a legitimate and solvent enterprise and by depositing funds received from Community First, or borrower payments that should have been transferred to Community First, into First United's commingled accounts and using those funds to make payments to other Participants and to otherwise perpetuate the Ponzi scheme.

20

59.     Community First's participations with First United included: (1) a $1 million participation dated September 30, 2004 in a counterfeit loan First United falsely represented it was making to Jerry and Vickie Moyes; (2) a $1 million participation dated November 1, 2004 in a counterfeit loan First United falsely represented it was making to Moyes Children's Limited Partnership—First United sold a total of $6 million in participations in the counterfeit loan; (3) a $1.5 million participation dated July 14, 2005 in an $8 million loan to JM Land Development II, LLC—First United sold a total of $49 million in participations in the $8 million loan; (4) a $1 million participation dated February 2, 2007 in a $13,875,000 loan to Wesdon Financial / MPB Holdings—First United sold a total of $14,875,000 in participations in the $13,875,000 loan; (5) a $1 million participation dated May 11, 2007 in a $1,809,142.40 loan to Yavapai Land Holdings; (6) a $1 million participation dated August 29, 2007 in a $6.65 million loan to Naupaka Investments, LLC—First United sold a total of $20.3 million in participations in the $6.65 million loan; (7) a $1.5 million participation dated January 1, 2008 in a $7 million loan to Whiteout Way Investments, LLC—First United sold a total of $23.65 million in participations in the $7 million loan; (8) a $1,198,397 participation dated September 12, 2008 in a $1.2 million loan to LaJolla Holdings Limited Partnership; and (9) a $1 million participation dated December 24, 2008 in a $1,575,000 loan to Greenline Properties, LLC—First United sold a total of $2 million in participations in the $1,575,000 loan.

60.     Based on the losses it suffered at the collapse of the Ponzi scheme, Community First's court-approved claim against Johnston and First United is $3,607,394

under the net-investment method. Community First had a claim against First United and Johnston of $5,201,425 as of the appointment of the Receiver under the principal and interest method.

## Labette Bank

61.    Labette Bank ("Labette") is a Kansas banking corporation with its principal place of business in Altamont, Kansas. Labette entered into at least 4 participations with First United, all of which involved loans, or purported loans, to the Moyes Parties. First United defrauded Labette in connection with every participation, including by representing that First United was a legitimate and solvent enterprise and by depositing funds received from Labette, or borrower payments that should have been transferred to Labette, into First United's commingled accounts and using those funds to make payments to other Participants and to otherwise perpetuate the Ponzi scheme.

62.    Labette's participation with First United included: (1) a $1.5 million participation dated November 14, 2003 in an underfunded $5 million loan to Jerry and Vickie Moyes—First United sold a total of $4 million in participations in the purported $5 million loan, but funded only $1 million to the Moyes; (2) a $500,000 participation dated March 19, 2004 in a counterfeit loan First United fraudulent represented it was making to Moyes Children's Limited Partnership—First United sold a total of $10.5 million in participations in the counterfeit loan; (3) a $500,000 participation dated June 27, 2007 in an $8 million loan to JM Land Development II, LLC—First United sold a total of $49 million in participations in the $8 million loan; and (4) a $500,000 participation dated June 27, 2007 in a $14,153,750 loan to McClellan Ranch Investments,

22

LLC—prior to entering into the participation with Labette, First United had already sold $18,153,750 in participations in the $14,153,750 loan.

63.     Based on the losses it suffered at the collapse of the Ponzi scheme, Labette's court-approved claim against Johnston and First United is $575,961 under the net-investment method.   Labette had a claim against First United and Johnston of $1,021,313 as of the appointment of the Receiver under the principal and interest method.

### Maple Bank

64.     Maple Bank ("Maple") is a Minnesota banking corporation with its principal place of business located in Champlin, Minnesota.  Maple entered into at least 1 participation with First United.  That participation involved a loan to the Moyes Parties. First United defrauded Maple in connection with the participation, including by representing that First United was a legitimate and solvent enterprise and by depositing funds received from Maple, or borrower payments that should have been transferred to Maple, into First United's commingled accounts and using those funds to make payments to other Participants and to otherwise perpetuate the Ponzi scheme.

65.     Maple entered into a $1 million participation on September 16, 2008 in a $1,575,000 loan to Greenline Properties, LLC—First United sold a total of $2 million in participations in the $1,575,000 loan.

66.     Based on the losses it suffered at the collapse of the Ponzi scheme, Maple's court-approved claim against Johnston and First United is $896,091 under the net-investment method.  Maple had a claim against First United and Johnston of $976,928 as of the appointment of the Receiver under the principal and interest method.

23

## Minnwest Bank Luverne

67.    Minnwest Bank Luverne ("Minnwest") is a Minnesota banking corporation

with its principal place of business in Luverne, Minnesota.  Minnwest entered into at least

7 participations with First United, all of which involved loans, or purported loans, to the

Moyes Parties.  First United defrauded Minnwest in connection with every participation,

including by representing that First United was a legitimate and solvent enterprise and by

depositing funds received from Minnwest, or borrower payments that should have been

transferred to Minnwest, into First United's commingled accounts and using those funds

to make payments to other Participants and to otherwise perpetuate the Ponzi scheme.

68.    Minnwest's participations with First United included: (1) a $5 million

participation dated August 8, 2003 in a counterfeit loan First United falsely represented it

was making to Jerry and Vickie Moyes; (2) a $5 million participation dated August 27,

2003 in a $5 million loan to Moyes Children's Limited Partnership; (3) a total of $3.5

million in participations pursuant to participations dated September 18, 2003 and

September 19, 2003 in a $3.5 million loan to Jerry and Vickie Moyes; (4) a $5 million

participation dated January 14, 2008 in a $7 million loan to Whiteout Way Investments,

LLC—First United sold a total of $23.65 million in participations in the $7 million loan;

(5) a $2.5 million participation dated January 30, 2008 in a $2.5 million loan to CB

Ranch South LLC—prior to entering into the participation with Minnwest, First United

had already sold $9 million in participations in the $2.5 million loan; and (6) a $2.875

million participation dated March 4, 2008 in a $2.875 million loan to JM Land

24

Development II, LLC—First United sold a total of $3.275 in participations in the $2.875 million loan.

69.     Based on the losses it suffered at the collapse of the Ponzi scheme, Minnwest's court-approved claim against Johnston and First United is $6,205,977 under the net-investment method. Minnwest had a claim against First United and Johnston of $10,150,982 as of the appointment of the Receiver under the principal and interest method.

### Republic Bank of Chicago

70.     Republic Bank of Chicago ("Republic Bank") is an Illinois banking corporation with its principal place of business in Oak Brook, Illinois. Republic Bank entered into at least 3 participations with First United, all of which involved loans, or purported loans, to the Moyes Parties. First United defrauded Republic Bank in connection with every participation, including by representing that First United was a legitimate and solvent enterprise and by depositing funds received from Republic Bank, or borrower payments that should have been transferred to Republic Bank, into First United's commingled accounts and using those funds to make payments to other Participants and to otherwise perpetuate the Ponzi scheme.

71.     Republic Bank's participations with First United included: (1) a total of $10 million in participations, based on participations with First United on March 9, 2007, March 14, 2007, March 27, 2007, and April 4, 2007, in a $10 million loan to Jerry and Vickie Moyes; (2) a $2,372,500 participation dated March 25, 2008 in a $2,372,500 loan to Lancaster Land, LLC—First United sold a total of $3,372,500 in participations in the

$2,372,500 loan; and (3) a $4,837,500 participation dated May 29, 2008 in a $4,837,500 loan to Jerry and Vickie Moyes—First United sold a total of $6,412,500 in participations in the $4,837,500 loan.

72.     Based on the losses it suffered at the collapse of the Ponzi scheme, Republic Bank's court-approved claim against Johnston and First United is $6,255,683 under the net-investment method.  Republic Bank had a claim against First United and Johnston of $6,972,750 as of the appointment of the Receiver under the principal and interest method.

## Sonoran Bank, N.A.

73.     Sonoran Bank, N.A. was an Arizona banking corporation with its principal place of business in Phoenix, Arizona.  During or about 2012, Sonoran Bank, N.A. merged with Kansas State Bank of Manhattan, which is a Kansas banking corporation with its principal place of business in Manhattan, Kansas (collectively, "Sonoran"). Sonoran entered into at least 3 participations with First United, all of which involved loans, or purported loans, to the Moyes Parties.  First United defrauded Sonoran in connection with every participation, including by representing that First United was a legitimate and solvent enterprise and by depositing funds received from Sonoran, or borrower payments that should have been transferred to Sonoran, into First United's commingled accounts and using those funds to make payments to other Participants and to otherwise perpetuate the Ponzi scheme.

74.     Sonoran's participations with First United included: (1) a $1 million participation dated October 30, 2006 in a $3.25 million loan to Jerry and Vickie Moyes—

26

prior to entering into the participation with Sonoran, First United had already sold $10.6 million in participations in the $3.25 million loan; (2) a $1 million participation dated May 21, 2007 in an $8 million loan to JM Land Development II, LLC—First United sold a total of $49 million in participations in the $8 million loan; and (3) a $1.15 million participation in a $7 million loan to Whiteout Way Investments, LLC—First United sold a total of $23.65 million in the $7 million loan.

75.     Based on the losses it suffered at the collapse of the Ponzi scheme, Sonoran's court-approved claim against Johnston and First United is $864,221 under the net-investment method.   Sonoran had a claim against First United and Johnston of $1,071,106 as of the appointment of the Receiver under the principal and interest method.

## Texas Bank Financial

76.     Texas Bank Financial is Texas banking corporation with its principal place of business in Weatherford, Texas.   Texas Bank Financial, through its predecessor-in-interest, The Bank of Weatherford, Texas (collectively, "TBF"), entered into at least 1 participation with First United. That participation involved a loan to the Moyes Parties. First United defrauded TBF in connection with the participation, including by representing that First United was a legitimate and solvent enterprise and by depositing funds received from TBF, or borrower payments that should have been transferred to TBF, into First United's commingled accounts and using those funds to make payments to other Participants and to otherwise perpetuate the Ponzi scheme.

27

77.     TBF entered into a $1 million participation on March 26, 2008 in a $2,372,500 loan to Lancaster Land, LLC—First United sold a total of $3,372,500 in participations in the $2,372,500 loan.

78.     Based on the losses it suffered at the collapse of the Ponzi scheme, TBF's court-approved claim against Johnston and First United is $788,615 under the net-investment method.  TBF had a claim against First United and Johnston of $905,760 as of the appointment of the Receiver under the principal and interest method.

## THE National Bank

79.     THE National Bank ("TNB") is an Iowa banking corporation with its principal place of business located in Bettendorf, Iowa.  TNB entered into at least 24 participations with First United, of which 19 involved loans, or purported loans, to the Moyes Parties.  First United defrauded TNB in connection with every participation, including by representing that First United was a legitimate and solvent enterprise and by depositing funds received from TNB, or borrower payments that should have been transferred to TNB, into First United's commingled accounts and using those funds to make payments to other Participants and to otherwise perpetuate the Ponzi scheme.

80.     TNB's participations with First United included: (1) approximately $3 million in participations in approximately $3 million in loans to Piedmont Center Investments II, LLC pursuant to participations dated February 8, 2002 and August 15, 2002; (2) a $1.45 million participation dated March 18, 2002 in a $1.45 million loan to Dhillon, Inc.; (3) a $2.5 million participation dated March 28, 2002 for a $3.06 million loan to Steve Ellman; (4) a $3 million participation dated June 28, 2002 in a $3 million

28

loan to Interstate Equipment Leasing, Inc.; (5) a $3 million participation dated August 1, 2002 in an under participated $6 million loan to Jerry and Vickie Moyes; (5) a $2.5 million participation dated August 9, 2002 in a $2.5 million loan to Moyes Children's Limited Partnership; (6) a $1.75 million participation dated November 14, 2002 in a $1.75 million loan to James and Suzanne Heflin; (7) a $1.5 million participation dated July 8, 2003 in an underfunded $1.5 million loan to Greenline Properties, LLC—only $1 million was transferred to the borrower; (8) a $4.5 million participation dated September 25, 2003 in an under participated $5.5 million loan to JM Land Development, LLC; (9) a $2.7 million participation dated October 14, 2003 in a $2.7 million loan to Interstate Equipment Leasing, Inc.; (10) a $2.3 million participation dated October 23, 2003 in a counterfeit loan First United falsely represented that it was making to Interstate Equipment Leasing, Inc.; (11) a $2.1 million participation dated November 14, 2003 in a $2.1 million loan to Jerry and Vickie Moyes; (12) a $360,000 participation dated December 23, 2003 in a counterfeit loan First United falsely represented that it was making to Hatteras, LLC; (13) a $4.5 million participation dated October 29, 2004 in a $4.5 million loan to Carefree Capital Investments, LLC; (14) an approximately $2.35 million participation dated December 1, 2004 in a $4 million loan to Interstate Equipment Leasing, Inc.; (15) a $3.5 million participation dated August 5, 2005 in a $3.5 million loan to Yavapai Land Holdings—First United sold a total of $5.5 million in participations in the $3.5 million loan; (16) an $887,677.86 participation dated April 27, 2006 in a counterfeit loan First United falsely represented that it was making to Jerry and Vickie Moyes; (17) a $10 million participation dated July 31, 2006 in a $10 million loan to

29

Greenline Properties, LLC—First United sold a total of $12.5 million in participations in the $10 million loan; (18) a $5 million participation dated January 12, 2007 in a $5 million loan to Jerry and Vickie Moyes—First United sold a total of $6 million in participations in the $5 million loan; (19) a $5 million participation dated March 8, 2007 in a $5 million loan to Carefree Capital Investments, LLC; (20) an $8 million participation dated July 12, 2007 in an $8 million loan to JM Land Development II, LLC—prior to entering into the participation with TNB, First United had already sold $41 million in participations in the $8 million loan; (21) a $2.5 million participation dated November 29, 2007 in a $2.5 million loan to CB Ranch South LLC—First United sold a total of $11.5 million in participations in the $2.5 million loan; (22) a $7 million participation dated December 28, 2007 in a $7 million loan to Whiteout Way Investments, LLC—First United sold a total of $23.65 million in participations in the $7 million loan; (23) a $1,943,500 participation dated April 1, 2008 in an under participated $2 million loan to JM Land Development II, LLC; and (24) a $2.5 million participation dated March 27, 2009 in a counterfeit loan First United falsely represented that it was making to Jerry and Vickie Moyes.

81.    Based on the losses it suffered at the collapse of the Ponzi scheme, TNB's court-approved claim against Johnston and First United is $9,926,908 under the net-investment method.  TNB had a claim against First United and Johnston of $20,789,208 as of the appointment of the Receiver under the principal and interest method.

## Western National Bank

82.     Western National Bank ("Western") is a Texas banking corporation with its principal place of business in Midland, Texas.     Western entered into at least 6 participations with First United, of which 5 involved loans, or purported loans, to the Moyes Parties. First United defrauded Western in connection with every participation, including by representing that First United was a legitimate and solvent enterprise and by depositing funds received from Western, or borrower payments that should have been transferred to Western, into First United's commingled accounts and using those funds to make payments to other Participants and to otherwise perpetuate the Ponzi scheme.

83.     Western's participations with First United included: (1) a $5 million participation dated December 20, 2005 in a $5 million loan to Jerry and Vickie Moyes; (2) a $3.25 million participation dated August 4, 2006 in a $3.25 million loan to Jerry and Vickie Moyes—First United sold a total of $11.6 million in participations in the $3.25 million loan; (3) an $8 million participation dated June 14, 2007 in an $8 million loan to JM Land Development II, LLC—First United sold a total of $49 million in participations in the $8 million loan; (4) a $6.65 million participation dated August 27, 2007 in a $6.65 million loan to Naupaka Investments, LLC—First United sold a total of $20.3 million in participations in the $6.65 million loan; (5) a $2.5 million participation dated November 27, 2007 in a $2.5 million loan to CB Ranch South, LLC—First United sold a total of $11.5 million in participations in the $2.5 million loan; and (6) a $7 million participation dated January 28, 2008 in a $7 million loan to Whiteout Way Investments, LLC—prior to

31

entering into the participation with Western, First United had already sold $16.65 million in participations in the $7 million loan.

84.     Based on the losses it suffered at the collapse of the Ponzi scheme, Western's court-approved claim against Johnston and First United is $19,810,570 under the net-investment method.  Western had a claim against First United and Johnston of $23,910,296 as of the appointment of the Receiver under the principal and interest method.

## THE MOYES PARTIES WERE IN FINANCIAL DISTRESS AND BENEFITED FROM LOANS FROM FIRST UNITED

85.     Jerry and Vickie Moyes individually or collectively owned or controlled a number of entities that engaged in transactions with Johnston and First United throughout 2002 to 2009, including The Jerry and Vickie Moyes Family Trust, Moyes Children's Limited Partnership, Midtown Joint Ventures, LLC, Coolidge 600, LLC, Interstate Equipment Leasing, Inc., Carefree Capital Investments, LLC, Palm Beach Resort Condominiums, LLC, Whiteout Way Investments, LLC, Greenline Properties, L.L.C., JM Investment Properties, L.L.C., JM Land Development, LLC, JM Land Development II, LLC, McClellan Ranch Investment, L.L.C., Yavapai Land Holdings, LLC, CB Ranch South, L.L.C., Lancaster Land, LLC, and Fort Worth Property, LLC (collectively the "Moyes Parties").

86.     Since at least 2002, Jerry and Vickie Moyes' individual or collective business interests have included the Phoenix Coyotes, Swift Transportation, Swift Air, and multiple real estate development projects.

32

87.     During the period of Johnston's Ponzi scheme, the Moyes Parties were unable to pay all their outstanding debts and were reliant on borrowing additional funds or closing transactions to pay outstanding debts. As a result, as stated by counsel for the Moyes Parties, a default on one obligation could create a "domino effect."

88.     Without Johnston's Ponzi scheme and Defendants aiding and abetting the scheme, the Moyes Parties would not have been able to obtain hundreds of millions in loans to preserve the Moyes Parties' holdings, including ownership and control of Swift Transportation.

89.     In 2001, the Moyes acquired a minority ownership interest in the Phoenix Coyotes. The majority owner was Steven Ellman. Later, the Moyes became the majority owners of the Phoenix Coyotes. Upon information and belief, during the Moyes' period of ownership, the Phoenix Coyotes sustained operating losses totaling over $200 million.

90.     Steve Ellman and the Moyes obtained more than $30 million in loans from First United and a prior employer of Johnston to fund, in part, the Phoenix Coyotes' operating expenses. At the time the loans were made by First United, there was a substantial risk of default and the borrowers in fact defaulted on the loans, including by failing to pay amounts when due.

91.     In May 2009, the Phoenix Coyotes filed a Chapter 11 bankruptcy case. At the conclusion of the bankruptcy case, the Moyes lost their ownership interest in the Phoenix Coyotes. In addition, the NHL sued Jerry Moyes for tens of millions in losses that they asserted the NHL was forced to cover.

33

92.   Swift Transportation also experienced financial difficulties.  Jerry Moyes started Swift Transportation, a national trucking firm.  Swift Transportation later became a public company.  Jerry Moyes was the CEO and Chairman of the public company.

93.   Jerry Moyes and the Defendants pledged Swift Transportation stock they owned to secure loans.  By the end of 2002, the Moyes Parties had obtained at least $235 million in loans by pledging Swift Transportation Stock.  Schedules tracking these loans and exchanged with Johnston show that by January 2003—and even without taking into account stock pledged to purportedly secure loans for First United—the loans were in default, margin loans were being called or were resulting in significant interest charges being paid or accruing on a monthly basis.  The schedules also show that the Defendants had over pledged stock by January 2003, and, upon information and belief, the Moyes Parties were over pledging their collateral before 2003.

94.   By November 2003, one financial institution—Oppenheimer—had made at least $35 million in loans to the Moyes Parties secured by Swift Transportation stock. Oppenheimer became concerned about these loans and demanded that the loans be paid down by $25 million within 14 days.  If not, Oppenheimer threatened that it "will be forced to take the appropriate actions."  The Moyes Parties paid down the loan to Oppenheimer by obtaining a loan from First Tennessee Bank.  The account purportedly securing the new loan often did not have the required collateral, and upon information and belief, the Moyes Parties did not disclose to First Tennessee interests claimed by other lenders in the account.

95.     In August 2004, Oppenheimer was approached about making additional loans to the Moyes Parties secured by their Swift Transportation stock.  Oppenheimer declined, noting the stock was "pledged or margined all over the place."  A copy of Oppenheimer's correspondence is attached as **Exhibit H**.

96.     In 2005, the Securities and Exchange Commission filed an enforcement action against Jerry Moyes relating to his trading of Swift Transportation stock while CEO and Chairman.  The SEC's complaint alleged that Jerry Moyes bought 187,000 shares of Swift Transportation stock based on insider information.  Jerry Moyes agreed to pay approximately $1.25 million in disgorgement, prejudgment interest and penalties to settle the matter.  At the same time, Jerry Moyes stepped down as CEO and Chairman of Swift Transportation.

97.     The Moyes took back control of Swift Transportation in 2007 by taking the company private.  The Moyes financed the purchase with over $2 billion in debt.  In published news reports, Jerry Moyes stated "I went out on a limb to get it back, and the timing was horrible."

98.     In 2008, Moody's downgraded its rating on Swift Transportation's over $2 billion in debt.  Moody's reported that the "credit metrics and liquidity profile have deteriorated below levels anticipated when Moody's assigned the original rating to Swift in April 2007."  Moody's also reported that it expected these conditions to "persist through 2008 and into 2009."

99.     The Moyes also invested in a number of failed real estate development projects.  One such project was located in Orem, Utah called "Midtown Joint Ventures."

35

Midtown Joint Ventures was a condominium development project in which the Moyes held an ownership interest. Jerry Moyes also personally guaranteed tens of millions of dollars of loans for the project.

100. In January 2005, construction on the project stopped. In April 2005, construction was restarted and continued (based, in part, on the over $26 million stolen by Johnston from Participants and advanced by First United to Midtown Joint Ventures). In 2008, construction ground to a halt. After 2008, the project was mired in a morass of liens and lawsuits involving 45 banks, dozens of unpaid contractors and subcontractors, and Orem city. In one of these lawsuits, judgment was entered against Jerry Moyes individually in the amount of over $45 million.

101. The Moyes also invested in a condominium development project located in Las Vegas, Nevada. The Moyes held an ownership interest and Jerry Moyes also personally guaranteed loans.

102. The Las Vegas condominium project was principally financed by JP Morgan Chase. Following default, JP Morgan Chase foreclosed on the project and asserted that Jerry Moyes individually owed it over $50 million.

103. Jerry and Vickie Moyes reported significant losses on their tax returns. For example, in 2006, the Moyes reported "total income" of negative $25,637,929. Similarly, in 2007, the Moyes reported "total income" of negative $18,701,675.

104. Despite the negative income, the Moyes had significant unpaid tax obligations due, in part, to their transaction involving Swift Transportation stock.

36

## THE DEFENDANTS WERE AWARE OF AND SUBSTANTIALLY ASSISTED JOHNSTON'S FRAUDULENT CONDUCT

105.    The Moyes Parties, including Defendants, were the primary beneficiaries of Johnston and First United's Ponzi scheme. From 2002 until the collapse of the scheme in 2009, First United made approximately $705 million in loans in connection with the Ponzi scheme. More than $640 million of these loans were to the Moyes Parties—over 90%. Johnston and First United funded all, or substantially all, of the loans to the Moyes Parties with stolen and commingled funds.

106.    As described above, Johnston's scheme was dependent upon misrepresenting that loans were secured by Swift Transportation stock, selling participations in counterfeit, oversold and underfunded loans, and making no participant and under participant loans. Substantially all of these fraudulent transactions were made to the Defendants and the Moyes Parties.

107.    The Defendants had actual knowledge that Johnston and First United did not have the independent capital to fund any loans. The Defendants knew that to fund loans Johnston and First United had to sell participations in loans to Participants.

108.    The Defendants had actual knowledge of a number of specific Participants. As part of their due diligence process, individual Participants met with the Defendants, including Jerry Moyes. Other Participants had direct communication with the Defendants through other methods, including phone calls arranged through Johnston.

109.    In addition, loan documents provided by Johnston to the Moyes Parties included references to participations and specific Participants.

37

110.   Also, some Participants sent funds directly to the Moyes Parties, including

the following:

| Date | Bank | Amount |
|------|------|--------|
| 04/25/02 | State Bank & Trust | $1,800,000 |
| 07/05/02 | Dakota Funding | $2,500,000 |
| 07/05/02 | SY Funding | $2,500,000 |
| 08/09/02 | The National Bank | $2,500,000 |
| 12/17/03 | Mercantile | $5,000,000 |
| 07/07/05 | Centier Bank | $5,000,000 |
| 11/01/06 | Hillcrest Bank | $14,153,750 |

111.   In other instances, the Moyes Parties sent funds directly to the Participants,

even though these Participants had sent funds to First United.  These Participants include

First National Bank, Klein Bank, Sterling Bank, and Voyager Bank.

112.   The Defendants had actual knowledge that Johnston owed duties to the

Participants, including to disclose relationships with the Moyes Parties, and to accurately

present loan terms and the collateral to the Participants.  The Defendants knew that

Johnston owed a duty to the Participants to act as a prudent lender, including to secure

the loans with adequate collateral, to disclose defaults, and to commence collection

activity in the event of defaults.  Johnston provided loan documents to the Moyes Parties

that described the duties First United owed to Participants.  Jerry Moyes or other Moyes

Parties have also represented that they themselves entered into participation agreements

with First United.

113.   The Defendants, however, were not simply idle bystanders to Johnston and

First United's Ponzi scheme.  To the contrary, Defendants had actual knowledge of

38

Johnston's wrongful conduct and substantially assisted Johnston and First United in defrauding the Participants, which resulted in losses in excess of $135 million as of the time of the appointment of the Receiver. In exchange, Defendants or the Moyes Parties obtained hundreds of millions of dollars of loans, some of which were never repaid until the Receiver was appointed, or were not repaid at all. The Defendants also obtained millions of dollars in transfers, including a $2.7 million transfer to Jerry Moyes that was never repaid.

## The Defendants Had Knowledge Of Johnston's Fraudulent Conduct Beginning In 2002

114.   By at least July 2002, the Defendants knew that Johnston was engaging in fraudulent conduct in connection with approximately $30 million in loans Johnston had arranged to the Phoenix Coyotes and its then majority owner—Steven Ellman. The loans were made to fund, among other things, the Phoenix Coyotes' payroll. Jerry Moyes was aware of these loans because he held an ownership interest in the Phoenix Coyotes and personally guaranteed at least some of the loans. Jerry Moyes or the Moyes Parties also claimed to be a participant in certain of these loans.

115.   At the time of these loans, Johnston was working as a broker for Dougherty Funding, LLC ("Dougherty Funding"). Dougherty Funding was the lender. As the lender, Dougherty Funding should have received any referral fees in connection with the loans, and the loan proceeds should have flowed through an account belonging to Dougherty Funding.

39

116.    Instead, unbeknownst to Dougherty Funding, Johnston in concert with the Moyes Parties, diverted some of the loan proceeds to a separate account for a purported entity named J&L Asset Management (hereinafter, the "J&L Asset Management Account").

117.    The J&L Asset Management Account was opened in approximately July 2001 at the Lakeville, Minnesota branch office of U.S. Bank, N.A. (Johnston lived in Lakeville).  The account was established by Johnston, Lance Morque (a colleague of Johnston at Dougherty Funding and the co-founder of First United) and Jim Miller (in-house counsel for Moyes Parties).  Financial statements for the account were sent to Swift Transportation, a company controlled by Jerry Moyes.

118.    The J&L Asset Management Account was established to allow Johnston to steal funds from Dougherty Funding and to facilitate loans to Ellman and the Moyes Parties.  Specifically, Johnston used the J&L Asset Management Account to steal more than $1.5 million in fees from Dougherty Funding.  The Defendants were aware of the theft because they received account statements from the J&L Asset Management Account.

119.    Dougherty Funding began investigating the J&L Asset Management Account in 2002. As part of that investigation, Dougherty Funding approached Jim Miller, the Moyes Parties' counsel, about the transactions involving the account.  In a July 1, 2002 email to Miller, Dougherty Funding explained that it discovered that more than $1.5 million had been transferred through the J&L Asset Management Account that should have been paid to Dougherty Funding:

40

Specifically, various loan proceeds in the seven figure dollar range were deposited into this account without our knowledge or the apparent knowledge of at least some borrowers.   It is my belief that both contractually and legally all proceeds of loans that were not paid to borrowers or lenders as fees should have flowed through Dougherty Funding.  Any referral fees should have been disclosed to lenders and been paid directly by Dougherty Funding.

A copy of the July 1, 2002 email is attached as **Exhibit I**.

120.   Dougherty Funding posed specific questions to Miller regarding the J&L

Asset Management Account, including:

- "Why did employees of Dougherty Funding have a business relationship with you and Swift Transportation that apparently includes significant compensation for unknown reasons through the person of Mr. Moyes . . . ?"

- "Why are proceeds of loans originated by Dougherty Funding going to a J&L Asset Management Account without the knowledge of our firm?

- What is [J&L Asset Management] getting paid for?"

121.   As communicated by Dougherty Funding to Miller, the allegations were

extremely serious:

At the risk of sounding adversarial I cannot over emphasize the seriousness with which I view this matter and I feel compelled to vigorously investigate these transactions.  In addition to these questions, I have had conversations with legal counsel and if inappropriate transactions have occurred, the Dougherty Companies will have to respond accordingly.

122.   Notwithstanding the fact that Miller was a signor on the J&L Asset

Management Account and worked as counsel to the Moyes Parties at the address the

account statements were delivered, Miller disclaimed knowledge of the J&L Asset

Management Account.

123.   Dougherty Funding also made repeated inquiries to Steven Ellman (the borrower and majority owner of the Phoenix Coyotes) regarding the transactions through the J&L Asset Management Account.  In an effort to stave off the investigation, Johnston "ghost wrote" a letter for Ellman to send to Dougherty Funding.  Johnston requested that Ellman provide the letter "as soon as humanly possible."  In the letter, Ellman was to represent that he requested the loans, received the proceeds of the loans, and "authorized the execution of the origin and destination of each and every wire."

124.   Instead of disclaiming knowledge like Miller, Jerry Moyes actively attempted to thwart the investigation.   On December 6, 2002, Jerry Moyes sent Dougherty Funding a letter claiming that the account was "established to protect myself as Guarantor for the Steve Ellman loans."  Jerry Moyes represented he "acknowledge[d] this account" and his "office has received copies of monthly statements since its inception.  Due to the large amount of funds that passed through this account I want to assure you that the account has been audited by both my Treasurer and CFO and that all proceeds are accounted for."  Jerry Moyes concluded the letter by stating "I appreciate your concerns on this matter, but rest assured we are fully aware of business activity regarding J&L Asset Management."   A copy of this correspondence is attached as **Exhibit J**.

125.   Jerry Moyes' attempt to portray the transactions through the J&L Asset Management Account as somehow proper belied the reality of those transactions— Johnston in concert with the Moyes Parties had been siphoning referral fees from the J&L Asset Management Account that should have been remitted to Dougherty Funding.

Dougherty Funding notified the Moyes Parties that "Corey admitted wrongdoing" by diverting fees that Dougherty Funding should have received. Dougherty Funding also communicated that "this scenario was repeated with a loan to 'Bills Forest City' and maybe other loans."

126.  In an effort to bury the matter, all the outstanding loans brokered through Dougherty Funding were repaid by the Moyes Parties and other entities. Jerry and Vickie Moyes personally obtained millions of dollars in new loans from First United to pay off Dougherty Funding.

127.  Dougherty Funding's General Counsel, Thomas Abood, was not satisfied with the loan payoffs or Jerry Moyes' response and pressed further regarding the J&L Asset Management Account. In a letter dated December 12, 2002, Mr. Abood directed several questions to Jerry Moyes: (1) "please confirm that you did indeed write the December 6 letter," (2) "why Mr. Miller would disavow the account when we initially inquired about J&L Asset Management LLC", (3) "are you aware that the J&L Asset Management LLC account was used by Corey Johnston to receive certain fee payments in loans unrelated to the Arizona Hockey transactions," and (4)  "why payments to the J&L Asset Management account were described as "Broker Referral Fees"?  Mr. Abood also requested that Jerry Moyes confirm that Johnston did not receive any proceeds from the J&L Asset Management account, or any Moyes Parties or affiliates on account of the loans to the Phoenix Coyotes and Steve Ellman.  A copy of this correspondence is attached as **Exhibit K**.

43

128.    Upon information and belief, the Moyes Parties never responded to Mr. Abood's inquiry.   However, as part of later dealings with Johnston, counsel for the Moyes Parties threatened to expose Johnston to Mr. Abood, unless he met the Moyes Parties' demands.   Upon information and belief, these demands included causing First United to make millions of dollars in loans and transfers to Jerry Moyes, Defendants, or the Moyes Parties.

### The Defendants Were Aware Of And Perpetuated The Under-Collateralization Of Loans—A Central Aspect Of Johnston's Ponzi Scheme

129.    The Defendants and the Moyes Parties knew that Johnston and First United did not have sufficient capital to fund any loans; rather, Johnston had to enter into "Participation Agreements" or similar agreements with Participants to obtain funds.

130.    To induce the Participants to enter into Participation Agreements with First United, Johnston and the Defendants falsely represented beginning in 2002 that over $370 million in loans issued by First United were secured by stock pledged by the Defendants.   The false representations were contained in Participation Agreements and the accompanying loan documents signed by the Defendants, including pledge agreements.   These representations were false because the security did not exist or had already been pledged as security on other loans.

131.    The Defendants had actual knowledge of Johnston's and their own false representations based on the documents signed, spreadsheets exchanged with Johnston tracking the over-pledging of collateral, and attempts to halt an investigation conducted by a financial institution holding securities accounts.

44

132. At no time did the Defendants take any action to correct the false representations, which, if discovered, would have collapsed the Ponzi scheme and resulted in immediate collection actions by the Participants on millions of dollars in loans to the Moyes Parties. Instead, the Defendants continued to perpetuate the false representations in order to obtain additional loans and other transfers from First United through the Ponzi scheme.

A.   **Johnston And The Defendants Made False Representations To Participants Through Participation Agreements And Pledge Agreements.**

133. To obtain funds from Participants, First United entered into "Participation Agreements" with the Participants. First United typically utilized a form Participation Agreement. For example, First United entered into a participation agreement with TNB—a victim bank—related to a $2.5 million loan from First United to Defendant Moyes Children's Limited Partnership in August 2002. The Defendants were aware that TNB purchased an interest in the loan because, among other things, TNB transferred $2.5 million directly to Defendant Moyes Children's Limited Partnership on August 8, 2002. In addition, and upon information and belief, TNB met with the Moyes Parties, including Jerry Moyes.

134. In each of the Participation Agreements, First United, as "Lender," represented it "has made a loan to the Borrower." The "Loan" was evidenced by certain loan documents between First United and the borrower that were attached to the Participation Agreement as exhibits, which typically included a loan agreement, promissory note, guaranty, pledge agreement, and securities account control agreement.

45

Each Participation Agreement further provided that First United "is willing to sell a Participation Interest in the Loan to the Participant."

135. The Participation Agreement set forth the terms by which "Lender [First United] sells and Participant hereby purchases an undivided interest in and to the Loan and in the Collateral." The purchase amount of the "Participation Interest" could be the entire loan amount or some percentage and would be identified on an exhibit to the Participation Agreement. That amount would be wired by the Participant to First United or, in some instances, the borrower directly.

136. Once the funds were transferred by the Participant, First United was to "generally act as agent" in administering the loan for the benefit of the Participant. For example, First United was to "hold the Loan Documents and other Collateral in its name for the benefit of Lender, Participant, and the Other Participant(s)."

137. As part of administering the loan for the benefit of the Participant, First United was to collect from the borrower or any other obligor all amounts due under the loan. Once collected, First United was to "promptly account for and pay to Participant, by wire to Participant, Participant's portion of any and all such Collections on funds current in Minneapolis, Minnesota. Until remitted to Participant, Lender will hold Participant's share of all Collections."

138. In the event of a default under the loan, First United was obligated to provide the Participant notice of that default. With the knowledge and consent of the Participant, First United would then take collection actions against the borrower, other obligors, or collateral.

46

139.    In the event First United breached the Participation Agreement, including by making any "false or misstated" representation, the Participant was entitled to cause First United to "turn over . . . assign, endorse and transfer the Loan Documents and other loan collateral" to the Participant, which "relieved" First United from its duties as lender.

140.    The loan documents provided to and relied upon by the Participants included documents relating to accounts purportedly holding stock. These documents included third party pledge agreements, security account control agreements, and negative pledge agreements signed by Defendants. These and other documents and information signed by Defendants were transmitted by Johnston from the Defendants to the Participants.

141.    In each third party pledge agreement, the pledgor—one or more of the Defendants—represented that they maintained an account holding Swift Transportation stock at a financial institution. The applicable financial institution was identified by name and the account by number.

142.    To purportedly secure payment of a loan made by First United, one or more of the Defendants pledged as security "the Securities Account and all financial assets and other property now or at anytime hereafter held in the Securities Account."

143.    In each of the pledge agreements, one or more of the Defendants made representations to First United that were relied upon by the Participants that the securities account "is free and clear of all liens and encumbrances" and that a minimum balance shall be maintained in the account. But for these representations by Defendants, the Participants would not have purchased the participations. Stated differently, Defendants'

47

misrepresentations regarding the Securities Accounts were a condition precedent to Participants' purchasing interests in the loans.

144.    The Defendants' representations were knowingly false. The securities were not properly secured, were not exclusive to any loans, were not exclusive to loans made by First United, and the collateral in the accounts at times did not exist or was insufficient to meet the minimum collateral requirements of the loans issued by First United.

145.    For example, upon information and belief, the Moyes Parties executed third party pledge agreements related to a $6 million loan on July 31, 2002 and a $3.5 million loan on or about September 20, 2002.  The third party pledge agreements purported to grant First United a security interest in stock held in a collateral account maintained by Oppenheimer.  First United used the third party pledge agreements to induce Participants to purchase participation interests in both loans.  However, at the time that the Moyes Parties executed the third party pledge agreements, there was no stock in the collateral accounts.  Upon information and belief, the Moyes Parties knew, or should have known, that First United would use the third party pledge agreements to obtain funds from Participants.  By executing third party pledge agreements that represented that First United was acquiring an interest in stock in the collateral accounts when there was, in fact, no stock in the accounts, the Moyes Parties substantially assisted First United in defrauding Participants.

146.    Because the Defendants and Johnston were acting in concert, First United never made a margin call.  This was despite the fact that each and every one of the securities accounts associated with loans made by First United was pledged as collateral

48

for multiple loans that exceeded the value of the stock in each account, or the minimum collateral requirement, on more than one occasion. A summary of the loans pledged against each security account, and the amount by which the minimum collateral requirement of these loans exceeded the value of the stock held in each account is as follows:

- Account No. XXX-XXX5278 purportedly secured two loans totaling up to $7,000,000 with a minimum collateral requirement shortfall of up to $5,000,000.

- Account No. XXX-XXX5310 purportedly secured four loans totaling up to $16,500,000 with a minimum collateral requirement shortfall of up to $26,000,000.

- Account No. XXX-XXX1135 purportedly secured 22 loans—including loans from First Tennessee Bank, Coastal Banc, Centier Bank, and Voyager Bank—totaling up to $122,920,000 with a minimum collateral requirement shortfall of up to $164,572,382.

- Account No. XXX-XXX3438 purportedly secured 10 loans—including loans from First Tennessee Bank and CIB Bank—totaling up to $65,310,000 with a minimum collateral requirement shortfall of up to $82,867,405.

- Account No. XXX-XXX4774 purportedly secured four loans—including a loan from Compass Bank—totaling up to $32,500,000 with a minimum collateral requirement shortfall of up to $31,833,333.

- Account No. XXX-XXX5623 purportedly secured two loans—including a loan from First Tennessee Bank—totaling up to $10,000,000 with a minimum collateral requirement shortfall of up to $22,000,000.

- Account No. XXX-X1378 purportedly secured two loans—including a loan from RBC Centura Bank—totaling up to $20,000,000 with a minimum collateral requirement shortfall of up to $18,454,155.

- Account No. XXX-X4161 purportedly secured 15 loans totaling up to $77,367,800 with a minimum collateral requirement shortfall of up to $83,867,500.

- Account No. XXXX-2377 purportedly secured seven loans—including a loan from First Tennessee Bank—totaling up to $76,000,000 with a minimum collateral requirement shortfall of up to $136,000,000.

- Account No. XXXX-5773 purportedly secured nine loans totaling up to $126,450,000 with a minimum collateral requirement shortfall of up to $214,150,000.

- Account No. XXXX-6428 purportedly secured five loans totaling up to $19,180,000 with a minimum collateral requirement shortfall of up to $33,500,000.

- Account No. XXXX-6348 purportedly secured four loans totaling up to $26,150,000 with a minimum collateral requirement shortfall of up to $26,149,991.

- Account No. XXXX-3293 purportedly secured one loan for $3,250,000 with a minimum collateral requirement shortfall of up to $13,675,969.

147. The Defendants signed more than 100 fraudulent pledge documents involving First United, including third party pledge agreements and security account control agreements (the "Fraudulent Pledge Documents"), beginning in 2002. The representations related to over $370 million in loans that were made by First United to the Moyes Parties.

148. The Defendants had actual knowledge that the representations were false. The Defendants and Johnston exchanged schedules that—excluding loans from First United—showed securities were over-pledged beginning in 2003. The Defendants and Johnston also exchanged schedules that showed securities were oversold to First United in 2004. Upon information and belief, the Defendants and the Moyes Parties exchanged

50

additional spreadsheets that showed over pledging of securities to First United and other lenders.

149.   The Defendants also had actual knowledge that the representations contained in the Fraudulent Pledge Documents were conveyed by Johnston and First United to Participants to induce them to purchase participations and thereby enable Johnston and First United to fraudulently obtain funds to loan to the Moyes Parties. Upon information and belief, the schedules Johnston and the Defendants exchanged tracking the over-pledging of collateral and the information contained in them were never disclosed to any Participant by the Defendants or Johnston.

150.   Without these false representations in the Fraudulent Pledge Documents, First United would not have been able to sell $406 million in participations in $459 million in loans made or purportedly made by First United, including $73 million in counterfeit loans and $60 million in oversold loans, or make $367 million in loans to the Moyes Parties.

151.   The over-pledging of Swift Transportation stock also misrepresented the net worth of the Moyes Parties.  Without this misrepresentation, Participants would not have purchased tens of millions of dollars of participations (including counterfeit and oversold participations) in loans made or purportedly made by First United to the Moyes Parties that were not secured by Swift Transportation stock and upon which the Moyes Parties later defaulted.

51

**B.** **The Defendants And Counsel Confirmed They Had Actual Knowledge Of Over-Pledging.**

152. On April 6, 2004, another attorney for the Moyes Parties, Earl Scudder, sent an email to Johnston regarding the "under-collateralization" of loans and resulting breach of loan documents by the Moyes Parties. Scudder sent another email that same day stating he was flying to Minneapolis the next day to obtain Johnston's signature on a negative pledge agreement. Scudder threatened to expose Johnston to Dougherty Funding's counsel, Tom Abood, if he refused to meet: "If you are unavailable, or refuse to meet, I plan to meet with the author of two letters to Jerry Moyes, Dougherty's General Counsel, Tom Abood." Copies of Scudder's emails to Johnston on April 6, 2004, are attached as **Exhibits L and M.**

153. Scudder reiterated his threats to Johnston in an email one week later:

I am in Phoenix and expected you to honor your commitment to meet in Phoenix . . . which I assume is a signal that you do not intend to keep your commitment to cooperate with our investigation. It would be better for all who are involved if you would both cooperate and discuss this in person.

A copy of the April 13, 2004 email is attached as **Exhibit N.**

154. The Defendants and the Moyes Parties knew that the loans were massively under-collateralized, and knew that First United was making false representations to Participants regarding the security for the loans underlying their participation agreements. The Defendants, however, continued to substantially assist Johnston's fraud as long as Johnston did as they demanded.

155. Johnston and the Moyes Parties purported to resolve their dispute by entering into a "negative pledge agreement." Despite the "significant level of under-

collateralization," on May 3, 2004, Shumway sent Johnston a letter that Johnston could show to third parties purporting to absolve him as the object of the Moyes Parties' investigation. He closed by noting that "Mr. Moyes and I look forward to continuing to work with you."

156.    The Defendants' "investigation" however did not stop their fraudulent conduct and abetting of the Ponzi scheme. To the contrary, the Defendants did not inform any Participants or financial institutions about the under-collateralized loans or breached loan covenants. Moreover, the Defendants did not cease over-pledging collateral or making false representations in loan documents. Rather, the Defendants continued making false representations in order to obtain hundreds of millions in loans from First United and millions in transfers from First United that were never repaid.

## C.    In 2004, The Defendants Were Informed Of Unauthorized Signatures Concerning Pledges Of Stock.

157.    The Defendants also had actual knowledge that Johnston had arranged for unauthorized signatures. Despite this knowledge of Johnston's fraudulent activity, Defendants continued to provide substantial assistance to Johnston's Ponzi scheme.

158.    By September 2004, the Defendants learned that Lance Morque—First United's co-founder—had fraudulently and without authority signed an agreement relating to a collateral account pledged by Moyes Children Limited Partnership as security. On September 30, 2004, First Tennessee Bank sent a letter to Ellen Penrod (Jerry and Vickie Moyes' personal bookkeeper) requesting the execution of a new securities account control agreement. According to First Tennessee Bank, the new

agreement was necessary because "the representative for Oppenheimer [Fahnestock & Co.] that signed the agreement was not authorized to do so." That representative was Morque (who was then employed by Oppenheimer). A copy of the letter from First Tennessee Bank dated September 30, 2004, is attached as **Exhibit O**.

159.   Oppenheimer again notified the Moyes Parties in April 2005 regarding Morque's unauthorized signatures on collateral accounts, as well as the under-collateralization of loans from First United.

160.   Specifically, on April 12, 2005, Oppenheimer sent Jerry and Vickie Moyes a letter concerning certain securities accounts held on behalf of the Moyes Parties. As Oppenheimer explained, "[i]t has come to our attention that in connection with the 1135 Account a securities account control agreement, dated January 30, 2003 has been executed by each of you, Corey Johnston, representing a company called First United Funding, LLC, and Lance Morque, ostensibly representing Fahnestock & Co., which company is now known as Oppenheimer & Co., Inc."

161.   Oppenheimer informed the Moyes Parties that "Mr. Morque was not then and is not now authorized to execute the Securities Control Agreement or any other agreements on behalf of Oppenheimer [Fahnestock & Co.]" and that the agreements signed by Morque were "unauthorized, void and unenforceable."

162.   Oppenheimer further informed the Moyes that the stock in the collateral account had been pledged as security to another bank as a result of a separate control account agreement that Morque and Jerry and Vickie Moyes had failed to disclose:

> We are in receipt of correspondence from the former Coastal Banc, a Texas
> savings bank (now known as Hibernia Bank, "Coastal Bank") claiming a
> security interest in the 1135 Account as a result of a separate account
> control agreement executed by you, Coastal Banc and Mr. Morque
> ostensibly on behalf of Fahnestock & Co. Inc. This agreement was never
> shared with Oppenheimer until recently when the agreement was sent to
> Oppenheimer directly by Coastal Bank.   Oppenheimer was unaware
> therefore, that multiple lenders claimed a security interest in the 1135
> Account.

A copy of this correspondence is attached as **Exhibit P**.

163.    Oppenheimer expressed concern that the existence of additional creditors

"may result in undercollateralization of various loans" and stated that it is "in possession

of other correspondence which causes us concern about any real or purported security

interests in your accounts held at Oppenheimer." Further, Oppenheimer warned that the

undercollateralization may result in a "liquidation scenario" and "a potential change of

control of publicly traded Swift Transportation."   As a result, Oppenheimer demanded

that the Moyes Parties provide it with "the details of any loan, lien or security interest

pursuant to which the asset in any of the accounts listed above have been, or may have

been, used as collateral," along with the contact information for any "such lenders . . . or

security interest holders." Oppenheimer further demanded that the Moyes Parties provide

"transfer instructions for another broker-dealer or custodian in order to enable

Oppenheimer to transfer the Accounts to such broker-dealer or custodian" no later than

close of business on April 15, 2005.

164.    First United transferred $9,050,000 to Jerry and Vickie Moyes on April 26,

2005 pursuant to two loans. Upon information and belief, Jerry and Vickie Moyes used a

portion of the proceeds from the loans to pay-off their loan with Hibernia Bank in order

to prevent Hibernia Bank from further disclosing the fact that the Moyes Parties were over pledging securities accounts.

165.   The Moyes Parties' retained yet another attorney as "special litigation counsel" in an attempt to prevent Oppenheimer from uncovering the massive over pledging of stock in the Moyes Parties' security accounts. After Oppenheimer asked for the identity of all financial institutions that claimed an interest in the stock in the accounts, and stated that it intended to contact those financial institutions, counsel for the Moyes Parties' threatened to bring legal action against Oppenheimer for "tortious interference with the Moyes' banking relationships."

166.   The Moyes Parties refused to disclose which lenders had an interest in the accounts and, instead, claimed that "all lenders with an interest in accounts [1135] and [4774] have been contacted and have consented to moving these accounts to Wachovia Securities." Further, the Moyes Parties represented that "[t]here are no other pledge agreements related to these accounts." These statements were false. Specifically, the Defendants executed securities account control agreements with First United related to the accounts, which First United used to induce Participants to purchase participation interests in loans to the Moyes Parties. Participants in multiple loans issued by First United believed that the loans were secured by stock held at Oppenheimer. Instead, after May 25, 2005, there was no stock to secure First United's purported interest in the accounts. Copies of correspondence between Oppenheimer, Jerry Moyes, and the Moyes Parties' special litigation counsel relating to these issues are attached as **Exhibits Q and R**.

56

167.   Ultimately, the securities accounts at issue were moved to Wachovia Securities on or about May 25, 2005. Upon information and belief, the Moyes Parties did not disclose to Wachovia that Oppenheimer had discovered that loans were under collateralized. Further, upon information and belief, the Moyes Parties did not disclose to any Participants that they had moved the securities accounts and that, therefore, loans previously issued by First United and secured by securities accounts at Oppenheimer, were no longer secured by stock. Had such disclosures been made, the millions of dollars in loans would have been immediately due and payable and Johnston's Ponzi scheme would have collapsed.

168.   The Moyes Parties had a pre-existing relationship with an employee of Wachovia—Peter Ryan.   Upon information and belief, the Moyes Parties moved the securities accounts to Wachovia because they believed that they would be able to continue to over pledge stock with the assistance of Johnston, First United, and Ryan.

169.   First United and the Moyes Parties continued to over pledge collateral after the security accounts were transferred to Wachovia. Ryan purported to execute account control agreements on behalf of Wachovia with First United for the Moyes Parties' securities accounts.   First United then presented the account control agreements to Participants to entice them to enter into participation agreements for loans or purported loans to the Moyes Parties.   Ryan, however, was not authorized to execute account control agreements on behalf of Wachovia.   Wachovia was not aware that Ryan was executing the agreements, which resulted in significant over pledging of the accounts. Without Wachovia's knowledge, Johnston paid approximately $100,000 to Ryan

personally, upon information and belief, as payment for Ryan's unauthorized provision of account control agreements for the benefit of the Moyes Parties and Johnston. As a result of this arrangement, no collection activity was commenced at the direction of the Participants and the Moyes Parties continued to receive loans, despite the fact that they did not have adequate collateral to secure the financing.

170.   The practice of over pledging also continued with respect to two other securities accounts held at a third financial institution—Salomon Smith Barney.

171.   The Defendants knowingly and intentionally failed to disclose their knowledge regarding the inadequate collateral and over-pledging of the securities accounts and the fraudulent conduct relating to securities account control agreements by Johnston and First United to any Participants. The Defendants made the decision not to disclose this information to prevent immediate collection efforts on hundreds of millions of dollars in loans, so that they could continue to obtain low cost financing from a lender that they could influence and control, and in an effort to provide substantial assistance to Johnston and First United's Ponzi scheme.

### First United Loaned Tens Of Millions of Dollars To A Failed Development Project To Bail Out The Moyes Parties.

172.   Jerry Moyes had a direct or indirect ownership interest in a real estate development project located in Orem, Utah called "Midtown Joint Ventures."

173.   To fund the project, Midtown Joint Ventures, LLC obtained tens of millions in loans from a syndicate of banks. Jerry Moyes personally guaranteed those loans.

58

174. The project was faltering and Jerry Moyes' personal guarantees were at risk. In an attempt to remedy these issues, the Moyes Parties convinced Johnston to cause First United to loan in excess of $26 million to Midtown Joint Ventures, LLC. First United funded the loans beginning in March 2007 through November 2007.

175. Upon information and belief, the Moyes Parties convinced Johnston to cause First United to loan the millions of dollars under threat of disclosure of Johnston's fraudulent conduct. To the make the loans, First United had to sell millions in fraudulent participations, including participations in counterfeit and oversold loans. Indeed, Johnston purported to sell a participation interest in a loan that was already oversold on the same day he funded a portion of the loans to Midtown Joint Ventures. Without these fraudulently obtained funds, First United would not have been able to fund the transfers to Midtown Joint Ventures.

176. At the time First United made the loans, there was no reasonable expectation that the loans would be repaid. Indeed, Midtown Joint Ventures, LLC repaid only $3 million of the over $26 million in loans.

177. At the time of the Receiver's appointment, $23 million in loans had been in default for over two years. Johnston had taken no action to collect on the loans or the Moyes Parties' guarantees.

178. Upon information and belief, Johnston took no action to collect on the loans or the Moyes Parties' guarantees under the Defendants' threat of disclosure of Johnston's fraudulent conduct. Because of the Moyes Parties' knowledge of participation agreements, they knew that Johnston was defrauding participants in order to make the

59

loans and to avoid collection efforts on the Midtown Joint Ventures, LLC loans for the more than three years the loans were in default.

## Jerry and Vickie Moyes Were The Beneficiaries Of Fraudulent Transfers From First United.

179.   Jerry Moyes was the recipient of fraudulent transfers from First United that, upon information and belief, were obtained based on the Moyes Parties' threats to disclose Johnston's wrongful conduct.

180.   Jim Miller was in-house counsel for the Moyes Parties.   Miller held a membership interest in Coolidge 600, LLC—an entity to which Jerry Moyes had made certain loans.

181.   First United also made loans to Coolidge 600, LLC.   Specifically, in approximately January 2004, First United transferred a total of $2,100,000 to Coolidge 600, LLC.  That transfer was documented in Coolidge 600, LLC's records as a "loan."

182.   The Moyes Parties brought a lawsuit against Miller that resulted in Jerry Moyes acquiring membership interests in certain entities owned by Miller, including Coolidge 600, LLC.

183.   After Jerry Moyes acquired a membership interest in Coolidge 600, LLC, upon information and belief, Jerry Moyes demanded that Johnston pay him the amounts Coolidge 600, LLC owed to First United.   Upon information and belief, the Moyes Parties threatened to disclose Johnston's fraudulent conduct if the transfer was not made. Upon information and belief, the Moyes Parties knew that the funds Johnston had used to

make a loan to Coolidge 600, LLC were obtained from Participants, and that Johnston was defrauding Participants by transferring the funds to Jerry Moyes.

184.   On August 25, 2005, Ellen Penrod (Jerry and Vickie Moyes' personal bookkeeper) directed Coolidge 600, LLC to transfer $2,711,557 to Jerry Moyes on account of the repayment of "FUF's" loan to the company.  The $2,711,557 in funds constituted an asset of First United or First United had an interest in the funds.  First United, however, did not receive any value on account of the transfer of its assets to Jerry Moyes.

185.   The Moyes Parties attempted to conceal the diversion of $2.7 million in funds by failing to disclose information concerning the transactions, including in response to subpoenas served by the Receiver.

186.   The Receiver did not obtain records until September 2013 evidencing that the transfer from First United to Coolidge 600, LLC was treated as a loan and the over $2.7 million payment was diverted from First United to Jerry Moyes, at the direction of Jerry Moyes.

187.   Upon information and belief, all transfers received by Jerry Moyes in connection with Coolidge 600, LLC were received for his own benefit, as well as for the marital community.

### The Defendants Were Aware Of Numerous Additional "Red Flags" Regarding Johnston and First United's Ponzi Scheme.

188.   The Defendants had actual knowledge regarding numerous additional "red flags" related to Johnston and First United, that at a minimum, put them on notice that

Johnston and First United were operating a Ponzi scheme in which they obtained funds from the Participants based on fraudulent representations and omissions:

      A.    First United was an unregulated business. The Defendants knew that Johnston was the sole representative of First United and conducted business out of his home or garage in Lakeville, Minnesota. First United funded and administered over $640 million in loans to the Moyes Parties.

      B.    Ellen Penrod (Jerry and Vickie Moyes' personal bookkeeper) testified that she did not know why the Moyes Parties used First United for obtaining loans and that it was not for accounting reasons. Indeed, she stated that First United failed to provide loan or invoice numbers that tracked the particular funds being transferred to the Moyes Parties. In fact, many invoices Johnston sent were labeled "invoice 101." As a result, the Moyes Parties had to create their own numbering system for loans from First United. Further, Penrod testified that the invoices First United sent to the Moyes Parties were often not accurate and were inconsistent with terms of the loan documents. The Moyes Parties, however, never inquired about the inaccurate records or required Johnston and First United to provide more detailed records regarding the loans, sources of funds, or transfers of funds they were receiving from First United.

      C.    Penrod also testified that she had "misgivings" about Johnston and First United because the Moyes Parties would sometimes receive interest statements or payments from Participants and she would call Johnston asking what these were for and Johnston would respond "that's not yours, I'll get it

62

straightened out . . . they should be mailing that to [First United]." Penrod shared her concerns regarding Johnston and First United with the Defendants but was told not to worry about it.

D.      On at least 11 occasions between August 2002 and February 2007, the Defendants signed promissory notes for amounts greater than the funds actually received. The "underfunded loans" were one of the specific devices Johnston used to steal funds from Participants to perpetuate the Ponzi scheme. Specifically, Johnston would present the note signed by the borrower to Participants and sell participation interests in the face amount of the note. Johnston, however, did not advance to the borrower the full amount under the note. Instead, he retained funds to pay Participants on other transactions and to otherwise perpetuate the Ponzi scheme. The Defendants had actual knowledge that Johnston was selling participation interests in these loans, but were not receiving the funds represented in the promissory notes.

E.      Between March 2003 and March 2009, the Jerry and Vickie Moyes received over $6.1 million in loans from First United that were not evidenced by any loan documentation. Jerry and Vickie Moyes used these loans as "working capital." The Defendants knew First United had to sell participations to fund loans. However, First United could not sell participations in loans that were not documented. Accordingly, the Defendants knew that the source of the $6.1 million in undocumented loans were funds First United stole from Participants. Moreover, upon information and belief, First United provided these

63

undocumented loans, which Jerry and Vickie Moyes could not have obtained from other sources, to ensure the Moyes Parties would not reveal the Ponzi scheme.

     F.     The Defendants received loan documents from Johnston and First United that included whited-out sections or were otherwise doctored. The Defendants never inquired about these altered loan documents.

     G.     After Johnston pleaded guilty to his crimes, Jerry Moyes transferred at least $20,000 to Renee Johnston—Corey Johnston's wife. Upon information and belief, these funds were provided to ensure Corey and Renee Johnston's silence as to the Defendants' knowledge and substantial assistance of Johnston's fraudulent scheme.

## The Defendants Substantially Assisted And Materially Aided Johnston And First United's Ponzi Scheme.

189.     As the conduct described above demonstrates, the Defendants had actual knowledge of Johnston's wrongful conduct, and provided substantial assistance to Johnston in furtherance of the Ponzi scheme.

190.     Based on Defendants' knowledge of Johnston's Ponzi scheme, Defendants knew that it would be impossible for Johnston or First United to pay all of the Participants and that when the scheme collapsed, multiple Participants would be left with millions in losses.

191.     Absent the Moyes Parties' conduct, Johnston could not have perpetuated the Ponzi scheme. Had the Defendants notified Participants at any point from 2002 through 2009 regarding Johnston's fraudulent conduct or the under-collateralization of

the securities accounts, the Participants would not have transferred funds into the Ponzi scheme and the scheme would have collapsed.

192.   On at least two occasions, the Defendants actively thwarted investigations by financial institutions—Dougherty Funding and Oppenheimer—into the improper conduct of Johnston, the Moyes Parties, and others.

193.   The Defendants derived significant benefit in return for their assistance to Johnston and First United's fraudulent scheme.  The Moyes Parties received over $370 million in loans that they could not have received on the terms provided by First United absent the fraudulent scheme, they were able to miss payments and otherwise default on loans with First United without fear of enforcement, and they ultimately received millions in dollars in loans and other transfers from First United for which they did not provide any value.  Further, the funds from First United provided the Moyes Parties with an easy and unregulated source of financing and the opportunity to make other investments and earn additional returns.  These benefits gave the Defendants ample motive to assist Johnston's fraudulent activities involving the Participants.

## COUNT 1
### AIDING AND ABETTING FRAUD

194.   The Receiver restates and realleges the previous paragraphs of the Complaint as if fully set forth herein.

195.   Johnston and First United engaged in a Ponzi scheme to defraud Participants.  Johnston pleaded guilty to bank and wire fraud and, in doing so, admitted to

operating a Ponzi scheme. Based on Johnston's admissions in his plea agreement, numerous courts have held that First United was a Ponzi scheme as a matter of law.

196.   The Moyes Parties, including Defendants, were First United's primary borrowers and had actual knowledge of Johnston and First United's fraud against the Participants.

197.   As described in detail above, the Defendants provided substantial assistance to Johnston and First United in committing the fraud against the Participants, including by actively concealing Johnston and First United's fraudulent conduct, by thwarting investigations by financial institutions into the Ponzi scheme, and in assisting Johnston and First United in making false representations to Participants regarding the loans.

198.   The Defendants' assistance caused the fraud to be perpetuated and was a direct cause of the Participants' losses. Without the assistance of the Defendants, Johnston and First United would not have been able to perpetuate the Ponzi scheme and the Participants would not have become victims of the fraud.

199.   As a result of the Defendants' aiding and abetting First United's Ponzi scheme, the Receiver is entitled to recover damages for the Victim Participants in an amount in excess of $50,000.

**COUNT 2**
**AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**

200.   The Receiver restates and realleges the previous paragraphs of the Complaint as if fully set forth herein.

201.   At all material times, Johnston was the sole representative who controlled First United and as such owed the company and its creditors a fiduciary duty to discharge his duties in good faith, with the care that an ordinary prudent officer, member, or director in a like position would exercise and in a manner reasonably believed to be in the best financial interests of First United and its creditors.

202.   Johnston caused First United to make a series of loans to, or guaranteed by the Moyes Parties.   Johnston and First United's business ostensibly involved selling participation interests or assignments in such loans.   According to the participation agreements, First United was to act as an agent for the Participants and as such owed the participants a fiduciary duty of full disclosure regarding their participations.

203.   Johnston breached the fiduciary owed to First United and the Participants by using the company to induce banks to participate in loans to the Moyes Parties, and subsequently used the Participants' funds to perpetuate the Ponzi scheme and fund Johnston's lavish lifestyle.   Johnston exhibited a willful, fraudulent, reckless and/or negligent disregard for the financial interests of First United and the Participants with no legitimate or justifiable business purpose.

204.   The breach of fiduciary duty owed to First United and the Participants proximately caused financial injury to the Victim Participants in an amount in excess of $50,000.

205.   The Defendants had actual knowledge of the fiduciary duty owed to the Participants and rendered substantial assistance in regard to such breaches, including by concealing Johnston and First United's fraudulent conduct and acting in concert with

67

Johnston and First United in making false representations to Participants regarding the loans.

206.    The Defendants' assistance caused the fraud to be perpetuated and was a direct cause of the Participants' losses.    Without the assistance of the Defendants, Johnston and First United would not have been able to perpetuate the Ponzi scheme and the Participants would not have become victims of the fraud.

207.    As a result of the Defendants' aiding and abetting First United's breach of fiduciary duty, the Receiver is entitled to recover damages for the Victim Participants in an amount in excess of $50,000.

**COUNT 3**
**AVOIDANCE OF FRAUDULENT TRANSFERS UNDER MINN. STAT. §**
**513.44(a)(1)**
**(Against Jerry and Vickie Moyes)**

208.    The Receiver restates and realleges the previous paragraphs of the Complaint as if fully set forth herein.

209.    As discussed above, on or about August 25, 2005, Jerry Moyes received a transfer of $2,711,557, which was an asset of First United.

210.    The transfer received by Jerry Moyes was made with actual intent to hinder, delay, or defraud creditors of First United or Johnston.

211.    The transfer received by Jerry Moyes was made in furtherance of the Ponzi scheme and, therefore, was made with actual intent to hinder, delay, or defraud creditors of First United or Johnston as a matter of law.

212.    First United and Johnston were insolvent when the transfer was made.

68

213.   First United and Johnston were, as set forth above, engaged in a Ponzi scheme and, therefore, were insolvent throughout the period of the Ponzi scheme as a matter of law.

214.   First United did not receive reasonably equivalent value in exchange for the funds transferred to Jerry Moyes.

215.   First United and Johnston removed or concealed assets from their creditors by their transfer to Jerry Moyes.

216.   First United and Johnston did not disclose the transfer to Jerry Moyes to their creditors.

217.   Jerry Moyes did not disclose the transfer he received to the Receiver.

218.   The transfer received by Jerry Moyes constitutes a fraudulent transfer under Minn. Stat. § 513.44(a)(1) and is avoidable.   The Receiver is entitled to set aside and recover the transfer and is entitled to damages in an amount at least equal to the amount of the transfer.

219.   Upon information and belief, all transfers received by Jerry Moyes were received for his own benefit, as well as for the marital community.

### COUNT 4
### AVOIDANCE OF FRAUDULENT TRANSFERS UNDER MINN. STAT.
### § 513.44(a)(2)
### (Against Jerry and Vickie Moyes)

220.   The Receiver restates and realleges the previous paragraphs of the Complaint as if fully set forth herein.

69

221. As discussed above, on or about August 25, 2005, Jerry Moyes received a transfer of $2,711,557, which was an asset of First United.

222. The transfer received by Jerry Moyes was made with actual intent to hinder, delay, or defraud creditors of First United or Johnston.

223. The transfer received by Jerry Moyes was made in furtherance of the Ponzi scheme and, therefore, was made with actual intent to hinder, delay, or defraud creditors of First United or Johnston as a matter of law.

224. First United did not receive reasonably equivalent value in exchange for the transfer to Jerry Moyes.

225. At the time of the transfer set forth above, First United and Johnston were engaged in or were about to engage in business for which their remaining assets were unreasonably small in relation to their business.

226. First United and Johnston were insolvent when the transfer was made.

227. First United and Johnston were, as set forth above, engaged in a Ponzi scheme and, therefore, were insolvent throughout the period of the Ponzi scheme as a matter of law.

228. As a result of the transfer set forth above, First United and Johnston intended to incur, or believed or reasonably should have believed that they would incur, debts beyond their ability to pay as they became due.

229. The transfer received by Jerry Moyes constitutes a fraudulent transfer under Minn. Stat. § 513.44(a)(2) and is avoidable. The Receiver is entitled to set aside and

70

recover the transfer and is entitled to damages in an amount of at least equal to the transfer.

230.    Upon information and belief, all transfers received by Jerry Moyes were received for his own benefit, as well as for the marital community.

**COUNT 5**
**AVOIDANCE OF FRAUDULENT TRANSFERS MINN. STAT. § 513.45(a)**
**(Against Jerry and Vickie Moyes)**

231.    The Receiver restates and realleges the previous paragraphs of the Complaint as if fully set forth herein.

232.    As discussed above, on or about August 25, 2005, Jerry Moyes received a transfer of $2,711,557, which was an asset of First United.

233.    The transfer received by Jerry Moyes was made with actual intent to hinder, delay, or defraud creditors of First United or Johnston.

234.    The transfer received by Jerry Moyes was made in furtherance of the Ponzi scheme and, therefore, was made with actual intent to hinder, delay, or defraud creditors of First United or Johnston as a matter of law.

235.    First United did not receive reasonably equivalent value in exchange for the transfer to Jerry Moyes.

236.    First United and Johnston were insolvent when the transfer was made or became insolvent as a result of the transfer.

237.    One or more of First United and/or Johnston's creditor's claims arose before the transfer to Jerry Moyes. For example, TNB has been a creditor since at least February 15, 2002.

71

238.   The transfer constitutes a fraudulent transfer under Minn. Stat. § 513.45(a) and is avoidable.   The Receiver is entitled to set aside and recover the transfer and is entitled to damages in an amount of at least equal to the transfer.

239.   Upon information and belief, all transfers received by Jerry Moyes in connection with Coolidge 600, LLC were received for his own benefit, as well as for the marital community.

**COUNT 6**
**AVOIDANCE OF FRAUDULENT TRANSFERS**
**(Against Jerry and Vickie Moyes)**

240.   The Receiver restates and realleges the previous paragraphs of the Complaint as if fully set forth herein.

241.   This Count is asserted against Jerry Moyes in the alternative to Counts 3-5.

242.   As discussed above, on or about August 25, 2005, Jerry Moyes caused Coolidge 600, LLC to transfer him $2,711,557, which was an asset of First United.

243.   Jerry Moyes was an insider of Coolidge 600, LLC.

244.   First United was a creditor of Coolidge 600, LLC and was entitled to receive the amounts transferred to Jerry Moyes.

245.   The transfer from Coolidge 600, LLC to Jerry Moyes was made with actual intent to hinder, delay, or defraud creditors of Coolidge 600, LLC.

246.   Coolidge 600, LLC did not receive reasonably equivalent value in exchange for the funds it transferred to Jerry Moyes.

247.   Coolidge 600, LLC was insolvent when the transfer was made or became insolvent as a result of the transfer.   Alternatively, at the time of the transfer set forth

72

above, Coolidge 600, LLC (1) was engaged in or was about to engage in business for which its remaining assets were unreasonably small in relation to its business; and (2) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond their ability to pay as they became due.

248.   Coolidge 600, LLC removed or concealed assets from its creditors by its transfer to Jerry Moyes. Coolidge 600, LLC did not disclose the transfer to Jerry Moyes.

249.   One or more of the claims of Coolidge 600, LLC's creditors arose before the transfer to Jerry Moyes, including the claim of First United.

250.   The transfer to Jerry Moyes constitutes a fraudulent transfer under Minn. Stat. §§ 513.44(a)(1), 513.44(a)(2), 513.45(a) and is avoidable. The Receiver is entitled to set aside and recover the transfer and is entitled to damages in an amount at least equal to the amount of the transfer.

251.   Upon information and belief, all transfers received by Jerry Moyes were received for his own benefit, as well as for the marital community.

## COUNT 7
## UNJUST ENRICHMENT

252.   The Receiver restates and realleges the previous paragraphs of the Complaint as if fully set forth herein.

253.   The Defendants were beneficiaries of Johnston and First United's Ponzi scheme. The Moyes Parties were the primary borrowers and received over $640 million in loans from First United from 2002 through 2009.

73

254.    The Defendants also engaged in other transactions with Johnston that resulted in them obtaining millions of dollars of loans and other actually fraudulent transfers that were never repaid at the expense of Johnston's victims.

255.    The Defendants knew that Johnston and First United were obtaining funds from Participants based on false representations and omissions and that Johnston transferred funds from the Ponzi scheme to the Moyes Parties.

256.    The Defendants provided substantial assistance to Johnston and First United in committing the fraud against the Participants by signing Fraudulent Pledge Documents that misrepresented that the specific securities account were "free and clear of all liens and encumbrances except for this pledge" and that the value in the account met the minimum collateral balance requirement, and by failing to disclose its knowledge of the inadequate collateral and over-pledging of the securities accounts by Johnston and First United.

257.    The Defendants received substantial financial benefits from the Ponzi scheme.

258.    The Defendants are not entitled to retain the substantial benefits they received and it is unjust and inequitable for each of them to do so.

259.    The Receiver is entitled to recover damages for the Victim Participants in an amount in excess of $50,000.

## JURY DEMAND

1.    The Receiver demands a jury trial on all issues triable to a jury.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Patrick Finn and Lighthouse Management Group, Inc., as Receiver for First United Funding and Corey Johnston, request:

1.    Damages in excess of $50,000 against the Defendants, the exact amount to be proven at trial.

2.    Avoidance and recovery of the fraudulent transfers to Jerry and Vickie Moyes in the amount of at least $2,711,557.

3.    Pre-judgment and post-judgment interest.

4.    The Receiver's attorneys' fees, costs, and disbursements incurred in this action to the extent authorized by law.

5.    Such other relief as the Court deems just and equitable.


Dated: April 7, 2014

/s/ Ryan T. Murphy
Ryan T. Murphy (#311972)
Gregory E. Karpenko (#286473)
Joseph J. Cassioppi (#388238)
FREDRIKSON & BYRON, P.A.
4000 U.S. Bank Plaza
200 South Sixth Street
Minneapolis, MN 55402
Telephone:   612/492-7000
FAX:          612/492-7077
rmurphy@fredlaw.com
kgarpenko@fredlaw.com
jcassioppi@fredlaw.com

**ATTORNEYS FOR PLAINTIFF**

75

## ACKNOWLEDGMENT

Plaintiff acknowledges that sanctions may be imposed under Minn. Stat. § 549.211.

Dated: April 7, 2014

/s/ Ryan T. Murphy
Ryan T. Murphy (#311972)
Gregory E. Karpenko (#286473)
Joseph J. Cassioppi (#388238)
FREDRIKSON & BYRON, P.A.
4000 U.S. Bank Plaza
200 South Sixth Street
Minneapolis, MN 55402
Telephone:   612/492-7000
FAX:            612/492-7077
rmurphy@fredlaw.com
kgarpenko@fredlaw.com
jcassioppi@fredlaw.com

**ATTORNEYS FOR PLAINTIFF**

7046822

76