## UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| PATRICK FINN and LIGHTHOUSE MANAGEMENT GROUP, INC., *as Receiver for First United Funding, LLC and Corey N. Johnston*, | Civil No.  14-1293 (JRT/TNL) |
| Plaintiffs, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| JERRY C. MOYES and VICKIE L. MOYES, *individually and as Trustees of The Jerry and Vickie Moyes Family Trust*; MOYES CHILDREN'S LIMITED PARTNERSHIP; THE JERRY AND VICKIE MOYES FAMILY TRUST; and COOLIDGE 600 ACQUISITION CO., LLC, | |
| Defendants. | |

Gregory  E.  Karpenko,  Joseph  J.  Cassioppi,  and  Ryan  T.  Murphy, **FREDRIKSON & BYRON, P.A.**, 200 South Sixth Street, Suite 4000, Minneapolis, MN  55402, for plaintiffs.

Douglas L. Elsass and Lori A. Johnson, **NILAN JOHNSON LEWIS P.A.**, 120 South Sixth Street, Suite 400, Minneapolis MN  55402, for defendants.

This case arises from a Ponzi scheme whereby Corey Johnston under the name First United Funding, LLC ("First United") defrauded numerous banks.  A Minnesota district court appointed Plaintiffs Patrick Finn and Lighthouse Management Group, Inc. as receiver ("Receiver") for First United and Johnston.  Receiver seeks to collect funds on behalf of both the victim banks and First United from the alleged "primary [third-

party] beneficiaries" of Johnston's Ponzi scheme:  Defendants Jerry and Vickie Moyes (the "Moyeses"), Moyes Children's Limited Partnership ("MCLP"), The Jerry and Vickie Moyes Family Trust (the "Moyes Family Trust"),[1] and Coolidge 600 Acquisition Co., LLC ("Acquisition").  Acquisition now moves to dismiss all claims against it for lack of personal jurisdiction, and Receiver and Defendants separately move for partial summary judgment.  For the reasons set forth below, the Court will grant Acquisition's motion to dismiss.  The Court will also grant in part and deny in part both sides' motions for partial summary judgment.

## BACKGROUND

### I.    THE PARTIES

#### A.    Receiver

First United is a Minnesota LLC previously operated by Johnston.  (Declaration of Patrick Finn in Supp. of Pls.' Mot. for Partial Summ. J. ("Finn Decl.") ¶ 5 & Exs. A-C, June 17, 2016, Docket No. 151.)  Johnston, a Minnesota resident, used First United as part of a Ponzi scheme to defraud banks by, among other things, borrowing money from new banks to pay old banks and lying about the security for the loan.  (*Id.*); *see also Cmty. First Bank v. First United Funding, LLC*, 822 N.W.2d 306, 308-09 (Minn. Ct. App. 2012).  After the fraudulent scheme collapsed, a Minnesota district court authorized Receiver to enforce payment obligations owed to First United and investigate claims First United may have against any third party.  (Finn Decl., Ex. C at 22-21, 23.)  Receiver's

---

[1] The Moyeses, MCLP, and the Moyes Family Trust are collectively referred to as the "Moyes parties."

authority includes both managing claims on behalf of First United's creditors (the "participant banks"), (Aff. of Lori A. Johnson in Supp. of Defs.' Mot. for Partial Summ. J. ("Johnson Aff."), Ex. 1 at 10-12, June 17, 2016, Docket No. 149), and enforcing payment obligations owed to First United, (Finn Decl., Ex. C at 21, 23).

### B.    The Moyes Parties

The Moyeses are a husband and wife who reside in Arizona.  (*Id.* ¶ 2.)  The Moyeses are the trustees of the Moyes Family Trust, a trust formed under Arizona law that holds assets and interests in companies.  (*Id.* ¶ 3 & Ex. D.)  MCLP is a limited partnership formed under Arizona law and holds interests and assets on behalf of the Moyeses' children.  (*Id.* ¶ 4.)

### C.    Acquisition

Acquisition is an Arizona LLC with two members:  ninety-nine percent interest-holder Carefree Capital Investments, LLC ("Carefree") and one percent interest-holder the Moyes Family Trust.  (Aff. of Gerald F. Ehrlich ("Ehrlich Aff.") ¶ 6 & Exs. A, C, June 17, 2016, Docket No. 154.)  Carefree is owned by the Moyes Family Trust and Jerry Moyes.  (Decl. of Patrick Finn in Opp. to Am. Mot. to Dismiss Acquisition ("Third Finn Decl.") ¶ 8 & Ex. F, July 22, 2016, Docket No. 171.)  Acquisition is taxed as a partnership and, therefore, is a flow-through entity for income tax purposes.  (Ehrlich Aff. ¶¶ 6-7.)  The parties agree Acquisition has no contacts with Minnesota and observes technical corporate formalities.

## II.   UNDERLYING PONZI SCHEME AND EARLY LITIGATION

In 2002, First United and Johnston "sold loan participations to banks, promising impressive returns." *Cmty. First Bank*, 822 N.W.2d at 308.  In fact, First United and Johnston conducted "a fraudulent scheme by overselling loan participations." *Id.*  "First United and Johnston sold participations to banks that had already been sold to other banks and sold participations in nonexistent loans." *Id.* at 309.  First United and Johnston paid early bank participants "with funds deposited by later participants, until the scheme collapsed." *Id.*

In August 2010, the U.S. Attorney's Office indicted Johnston on charges related to operating a Ponzi scheme involving "large commercial and personal loans."  (Finn Decl., Exs. E-F.)  Johnston pled guilty the following month; as part of the plea, Johnston admitted to "knowingly and intentionally" engaging in a scheme to defraud banks.  (*Id.*, Ex. F at 5-6.)

In September 2009, the participant banks commenced an action in state court, asserting Johnston and First United collectively owed approximately $135 million in unpaid principal, interest, and fees.  *Cmty. First Bank*, 822 N.W.2d at 309.  The state court appointed Receiver "to recover and to liquidate assets to pay the participant banks' outstanding claims."  *Id.*  After extensive briefing, the state court approved use of the "net-investment method" to calculate the participant banks' damages.  *Id.* at 309-10.  This method did not determine loss based on "the amount each bank was owed on the date that the receiver was appointed" – the so-called "principal and interest method" – and, instead, calculated damages based on "the amount a bank ha[d] invested, minus any

funds it ha[d] recovered." *Id.* at 309.  Thus, "[e]very dollar that First United had paid a bank [was] subtracted from the bank's principal investment." *Id.*; (*see also* Second Aff. of Lori Johnson in Supp. of Mot. for Partial Summ. J. ("Second Johnson Aff."), Ex. 1 at 2-3, Aug. 12, 2016, Docket No. 188).  The state court reasoned that applying the net-investment method, as opposed to the principal and interest method, ensured participant banks were not unjustly rewarded for "experienc[ing] 'legitimate' profits in the midst of a pervasive fraud," and the state court calculated the claim total at $91,193,042.  (Second Johnson Aff., Ex. 1 at 2-5.)

Similarly, at Johnston's federal-criminal sentencing, the Court applied the same damages calculation and concluded the government had "shown by a preponderance of the evidence" that the banks were "due restitution in the amount of $91,193,042."  (Am. Compl., Ex. G at 48, Feb. 24, 2016, Docket No. 93.)  The Court found $91,193,042 would "make the [participant banks] whole," "fully compensate [the participant banks] for their losses," and "restore [participant banks] to their original state of well-being." (*Id.* at 47 (quoting *United States v. Balentine*, 569 F.3d 801, 806 (8th Cir. 2009)).)  Since that time, Receiver successfully collected more than $81 million on behalf of the participant banks.   (Finn Decl. ¶ 6 (stating in June 2016 Receiver had distributed $81 million to the participant banks); Aff. of Douglas L. Elsass in Supp. of Defs.' Mot. to Supp. the Record ("Second Elsass Aff."), Nov. 3, 2016, Docket No. 195.)  Through this lawsuit, Receiver seeks to collect additional funds which Receiver alleges the Moyes parties and Acquisition owe First United and the participant banks.

## III.   THE MOYES PARTIES' ALLEGED DEALINGS WITH JOHNSTON AND FIRST UNITED

### A.   $642 Million In Loans from the Ponzi Scheme

In this lawsuit, Receiver alleges the Moyes parties were the primary beneficiaries of Johnston and First United's Ponzi scheme.  (Finn Decl. ¶ 9.)  Receiver asserts that during the course of the Ponzi scheme, First United provided the Moyes parties over $642 million in loans – more than ninety percent of the total loans First United issued. (*Id.*)  The Moyes parties needed the loans, in part, because they faced financial issues in connection with their ownership of the Phoenix Coyotes hockey team.  (*Id.*, Ex. G at 15:4-16:9, 45:6-48-23.)

Receiver claims the Moyes parties had actual knowledge of Johnston's fraudulent conduct and assisted Johnston and First United in defrauding the participant banks. Receiver states the Moyeses aided and abetted Johnston by fraudulently over-pledging loan collateral (*id.* at 86:3-26, 88:8-90:15; Decl. of Patrick Finn in Supp. of Pls.' Opp. to Defs.' Mot. for Partial Summ. J. ("Second Finn Decl."), Ex. A at 10:2-21, 14:6-15, July 22, 2016, Docket No. 169; *id.*, Ex. D at 9-10, *id.*, Ex. E at 14-27; *id.*, Exs. G-L), obtaining loans from Johnston after learning of the Ponzi scheme (Second Finn Decl., Ex. A at 9:12-10:1; *id.*, Exs. M-N), and continuing to do business with Johnston after realizing Johnston engaged in a kick-back scheme with the Moyeses' employee Jim Miller (Finn Decl., Ex. G at 99:11-100:11; *id.*, Ex. I at 19-25).

### B.    Loans to Midtown

In addition to claiming the Moyes parties are culpable for the Ponzi scheme by virtue of the loans they received from First United, Receiver alleges "[a]lmost all of the remaining loans were made to persons that the Moyes [p]arties introduced to Johnston." (Finn Decl. ¶ 9.)  According to Receiver, over the course of the Moyes parties' dealings with First United, the Moyeses convinced First United to issue loans to a financially-struggling real estate project in Utah – Midtown Joint Venture, L.C. ("Midtown").  (Finn Decl. ¶ 14; *id.*, Ex. K at 92:16-93:6; *id.*, Ex. L.)  Receiver alleges (and the Moyes parties dispute) that the Moyeses and the Moyes Family Trust guaranteed two of First United's loans to Midtown – the "MJV-FUF4" loan and the "MJV-FUF6" loan.[2]  Prior to Receiver's appointment, Midtown defaulted on its loans.[3]  Receiver argues First United is entitled to collect, but never collected, guarantees on these loans.  (*Id.* ¶ 17.)

### C.    Coolidge, Acquisition, and Allegations of Fraudulent Transfer

Finally, Receiver argues the Moyeses and Miller improperly received approximately $2.7 million that belonged to First United.  At one point, Miller and the Moyeses held interests in a development company known as Coolidge 600, LLC ("Coolidge").   (Finn Decl. ¶ 29.)   Receiver alleges First United loaned Coolidge

---

[2] The MJV-FUF4 loan totaled $3,587,000 and the MJV-FUF6 loan totaled $4,378,943. (Finn Decl. ¶ 18.)

[3] The Moyeses assert that they had no knowledge the loans were in default because the Moyeses were not the signatories to the loans and all loan proceeds went directly to Midtown. (*See* Aff. of Douglas L. Elsass in Opp. to Pl.'s Mot. for Partial Summ. J. ("Elsass Aff."), Ex. D, July 22, 2016, Docket No. 173; Second Decl. of J. Kevin Burdette ¶ 3, July 22, 2016, Docket No. 174.)

approximately $2.2 million between November 20, 2003 and January 26, 2004.  (*Id.*, Exs. W-X.)  In March 2004, the Moyeses learned Miller received illegal "kick-backs" from Johnston related to Coolidge.  (*Id.*, Ex. I ¶¶ 20, 58-82.)  The Moyeses filed a lawsuit against Miller and, eventually, entered into a settlement agreement in April 2005.  (*Id.*, Exs. I, Z.)  As part of the settlement, Miller agreed to transfer his interest in Coolidge to the Moyes Family Trust.  (*Id.*, Ex. Z §§ 3.1, 3.8.; Third Finn Decl., Ex. E at 3.)

Coolidge later sold its assets and allegedly transferred sale proceeds in excess of $8 million to Jerry Moyes in August 2005.  (Finn Decl., Ex. AA; Second Finn Decl., Ex. O.)  According to Receiver, approximately $2.7 million of the sum transferred belonged to First United because of First United's previous loan to Coolidge.[4]  (Finn Decl., Exs. X, AA-BB.)  Instead of transferring these sales proceeds to First United, Receiver opines Coolidge improperly transferred the money to the Moyeses in violation of Minnesota law.  (*Id.*)

Arguing in the alternative, Receiver asserts that Coolidge's records document that Coolidge transferred First United's loan to Acquisition and the Moyeses "booked that transfer as a loan from First United to . . . Acquisition."  (Third Finn Decl. ¶ 13 & Ex. J.)  Receiver claims Acquisition failed to repay the original loan and, instead, paid the money from the First United loan to Jerry Moyes.  (Am. Compl. ¶¶ 270-79.)  Receiver argues neither Acquisition nor Jerry Moyes repaid their loan, (Third Finn Decl. ¶ 13), and thus First United is entitled to damages for breach of a loan agreement.

---

[4] Allegedly, First United's original investment of approximately $2.2 million expanded to approximately $2.7 million after interest and promised returns.  (Finn Decl., Ex. X.)

The Moyeses point out that Receiver never located any loan documents to support this claim.[5]   The Moyeses further disagree with Receiver's characterization of events, alleging "the purpose of the transfer [from Acquisition to Jerry Moyes] was part of [the April 2005] settlement agreement between [Jerry] Moyes and . . . Miller."   (Decl. of Aaron Evans ("Evans Decl.") ¶ 5, July 22, 2016, Docket No. 176.)   Specifically, the Moyeses allege the transfer from Acquisition to Jerry Moyes "was for a return on the investor participation formerly held by Miller."   (*Id.*)

## IV.   THE MOYES PARTIES' DEALINGS WITH RECEIVER

The Moyes parties assert that after the state court appointed Receiver, their representatives worked in good faith to identify known loans and determine the amounts the Moyes parties borrowed from First United, ultimately agreeing to repayment terms. (*See* Decl. of J. Kevin Burdette ("Burdette Decl.") ¶¶ 2-4, June 17, 2016, Docket No. 150.)   On June 23, 2010, the Moyes parties signed a "Restructuring and Amended and Restated Loan Agreement" ("Restructuring Agreement") and, after four forbearances, the Moyeses repaid the amounts specifically set forth in the Restructuring Agreement – approximately $54 million between 2010 and August 2013.  (*Id.* ¶ 3; Finn Decl. ¶ 21 & Ex. N.)

---

[5] As evidence of this loan, Receiver points to a balance sheet where the Moyeses' accountant, Aaron Evans, referenced a "note payable to First United" for approximately $2.2 million.  (Decl. of Aaron Evans ("Evans Decl.") ¶ 3, July 22, 2016, Docket No. 176; Finn Decl., Ex. CC.)  But Evans testified that, because of insufficient information, he designated the loan in this way so he could leave it in "suspense" and later determine the nature of the entry. (Evans Decl., Ex. A at 100:10-101:20, 102:12-103:13, 121:12-122:18.)  Evans later attested the money should have been listed as an equity distribution.  (*Id.* ¶¶ 3-22.)  Receiver asks the Court to disregard Evans's declaration.

At the time of the Restructuring Agreement's execution, the parties agreed insufficient evidence existed to show the Moyeses signed the MJV-FUF4 and MJV-FUF6 guarantees. (Finn Decl., Ex. N §§ 9(z), 18.)[6] The Restructuring Agreement provided that if Receiver later discovered evidence that the Moyeses signed the MJV-FUF4 and MJV-FUF6 guarantees, the Moyeses and the Moyes Family Trust would honor the guarantees and repay the loans. (*Id.* § 9(z).) But the parties agreed to certain restrictions regarding this obligation, requiring Receiver to "present to" the Moyeses "enforceable guarantees executed by" the Moyeses in order to trigger the Moyes parties' duty to honor the guarantees. (*Id.*)

## V.   PROCEDURAL   HISTORY   AND   ACQUISITION'S   PERSONAL   JURISDICTION

In April 2014, Receiver filed this action against the Moyes parties after, allegedly, discovering evidence the Moyeses were aware of and actively assisted First United and Johnston's fraudulent conduct. (Notice of Removal, Attach. 1, Apr. 25, 2014, Docket No. 1.)

During discovery, Receiver uncovered a guarantee of the MJV-FUF4 loan which both Jerry and Vickie Moyes executed on July 20, 2007. (Finn Decl., Exs. P-Q.) Discovery also unearthed internal accounting records reporting that Jerry Moyes guaranteed both MJV-FUF4 and MJV-FUF6 (*id.*, Exs. R-S), and deposition testimony from an unrelated trial where Jerry Moyes admitted to executing MJV-FUF6 (*id.*, Ex. V). Also, as stated above, Receiver obtained evidence during discovery indicating the

---

[6] The Moyeses also asserted that, after the Ponzi scheme collapsed, many loan documents could not be found because of Johnston's haphazard recordkeeping. (Burdette Decl. ¶ 4.)

Moyeses treated their receipt of the $2.7 million related to Coolidge as a loan from First United to Acquisition.   (*See* Receiver's Mem. in Supp. of Mot. to Amend Compl., Oct. 29, 2015, Docket No. 57 at 6-7.)

On October 29, 2015, Receiver moved to amend its Complaint in light of this evidence in order to add Acquisition as a party and assert a breach of loan agreement claims against Acquisition and the Moyeses.   (Receiver's Mot. to Amend Compl., Oct. 29, 2015, Docket No. 55.)   The Moyes parties opposed the motion, arguing the Court lacked personal jurisdiction over Acquisition.   (Defs.' Mem. in Opp. to Receiver's Mot. to Amend Compl., Nov. 12, 2015, Docket No. 66.)

United States Magistrate Judge Tony N. Leung ultimately granted Receiver's motion.   (Order, Feb. 19, 2016, Docket No. 84.)   While the Magistrate Judge questioned the Court's jurisdiction over Acquisition, the Magistrate Judge concluded it was inappropriate to decide issues of jurisdiction on a motion to amend.   (*Id.* at 6-7.)

Receiver filed an Amended Complaint on February 24, 2016.   As relevant to the partial summary judgment motions,[7] Receiver asserts the following claims:   Aiding and Abetting Breach of Fiduciary Duty (Count 2); Avoidance of Fraudulent Transfers pursuant to Minn. Stat. § 513.44(a)(1) (Count 3); Breach of MJV-FUF4 and MJV-FUF6 (Count 8); and Unjust Enrichment (Count 9).   (Am. Compl. ¶¶ 218-37, 270-94.)   The Court finds Receiver alleges Counts 2-3 and 9 on behalf of the participant banks (*id.*

---

[7] Neither party seeks summary judgment on Count 1 (Aiding and Abetting Fraud), Counts 4-6 (Avoidance of Fraudulent Transfers), or Count 7 (Breach of Loan Agreement).   (Am. Compl. ¶¶ 212-17, 238-79.)   The Court finds Receiver asserts Counts 1 and 4-5 on behalf of the participant banks, (*id.* ¶¶ 217, 240-41, 251-52), and Count 6-7 on behalf of First United (*id.* ¶¶ 260-63; 276-278).

¶¶ 225, 228-29, 289-91, 294), and Counts 8 on behalf of First United (*id.* ¶¶ 276-77, 286).

After Receiver filed the Amended Complaint, Acquisition filed a motion to dismiss for lack of personal jurisdiction.  Around the same time, both sides filed cross-motions for partial summary judgment – Receiver on Counts 3 and 8, and Defendants on Counts 2, part of 8, and 9.  Defendants also request the Court find that Receiver is precluded as a matter of law from re-litigating the issue of damages.

## DISCUSSION

## I.   MOTION TO DISMISS – LACK OF PERSONAL JURISDICTION

### A.   Standard of Review

The Court must first address whether it may exercise personal jurisdiction over Acquisition.  When a party challenges personal jurisdiction under Fed. R. Civ. P. 12(b)(2), and where, as here, the parties have conducted discovery, Receiver has "the burden of proving by a preponderance of the evidence the facts necessary to establish personal jurisdiction over [Acquisition]."  *Safco Prods. Co. v. WelCom Prods., Inc.*, 730 F. Supp. 2d 959, 963 (D. Minn. 2010) (quoting *Pieczenik v. Dyax Corp.*, 265 F.3d 1329, 1334 (Fed. Cir. 2001)).  The Court must view all facts in the light most favorable to Receiver and resolve all factual conflicts in Receiver's favor.  *Janel Russell Designs, Inc. v. Mendelson & Assocs., Inc.*, 114 F. Supp. 2d 856, 861 (D. Minn. 2000).

The Court can exercise personal jurisdiction over a nonresident defendant if (1) Minnesota's long-arm statute, Minn. Stat. § 543.19, is satisfied; and (2) the exercise

of personal jurisdiction does not offend due process. *See Stanton v. St. Jude Med., Inc.*, 340 F.3d 690, 693 (8th Cir. 2003). Because Minnesota's long-arm statute extends the personal jurisdiction of Minnesota courts as far as due process allows, *In re Minn. Asbestos Litig.*, 552 N.W.2d 242, 246 (Minn. 1996), the Court need only evaluate whether the exercise of personal jurisdiction comports with the requirements of due process, *Guinness Imp. Co. v. Mark VII Distribs., Inc.*, 153 F.3d 607, 614 (8th Cir. 1998).

Due process requires that Acquisition have "certain minimum contacts" with the forum state "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). Sufficient minimum contacts exist if Acquisition's "conduct and connection with the forum State are such that [it] should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). There must be some act by which Acquisition "purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958). But contacts that are merely random, fortuitous, attenuated, or the result of "unilateral activity of another party or a third person" do not support personal jurisdiction. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985) (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 366 U.S. 408, 417 (1984)).

To determine whether Acquisition has sufficient contacts with the forum state, the Court examines five factors: "(1) the nature and quality of contacts with the forum state;

(2) the quantity of the contacts; (3) the relation of the cause of action to the contacts;[8] (4) the interest of the forum state in providing a forum for its residents; and (5) convenience of the parties." *Epps v. Stewart Info. Servs. Corp.*, 327 F.3d 642, 648 (8th Cir. 2003). Whether personal jurisdiction can be asserted over a corporation under an alter-ego theory is a question of state law. *See BioFuels Automation, Inc. v. Kiewit Energy Co.*, No. 10-610, 2010 WL 3023391, at *2 (D. Minn. July 28, 2010).

### B.     Merits

Acquisition argues this Court lacks personal jurisdiction over it. Specifically, though Carefree Capital Investments and the Moyes Family Trust own Acquisition,[9] Acquisition asserts it is not the alter ego of the Moyeses. Receiver responds that the record shows Acquisition is the alter ego of the Moyeses, and therefore, the Court may exercise personal jurisdiction over Acquisition.

In Minnesota, a foreign corporation may be subject to personal jurisdiction by virtue of its subsidiary's activities in the forum, but "the companies must be organized and operated so that one corporation is an instrumentality or alter-ego of the other."

---

[8] The third factor distinguishes general and specific jurisdiction. *Wessels, Arnold & Henderson v. Nat'l Med. Waste, Inc.*, 65 F.3d 1427, 1432 & n.4 (8th Cir. 1995). General jurisdiction is present when a defendant has "continuous and systematic" contacts with the forum state and may be sued over any controversy, independent of whether the cause of action has a relationship to the defendant's activities. *Helicopteros Nacionales*, 466 U.S. at 416. Specific jurisdiction refers to jurisdiction over causes of action arising from or related to the defendant's actions within the forum state. *Burger King*, 471 U.S. at 472-73.

[9] Under general principles of alter-ego liability, "an ownership interest in the entity is not dispositive. Veil piercing is an equitable remedy, and courts are to consider 'reality and not form' in determining a party's involvement in a corporate enterprise." *Equity Tr. Co. Custodian ex rel. Eisenmenger IRA v. Cole*, 766 N.W.2d 334, 339 (Minn. Ct. App. 2009) (quoting *Hoyt Props., Inc. v. Prod. Res. Grp., LLC*, 736 N.W.2d 313, 318 (Minn. 2007)).

*Zimmerman v. Am. Inter-Ins. Exch.*, 386 N.W.2d 825, 828 (Minn. Ct. App. 1986); *see also JL Schwieters Constr., Inc. v. Goldridge Constr., Inc.*, 788 N.W.2d 529, 535-36 (Minn. Ct. App. 2010). To assess "whether to pierce the corporate veil in order to exercise personal jurisdiction over a foreign corporation," Minnesota courts consider the alter-ego factors set forth in *Victoria Elevator Co. v. Meriden Grain Co.*, 283 N.W.2d 509, 512 (Minn. 1979).[10] *Hunter-Keith, Inc. v. Gen. Elec. Credit Corp.*, No. 4-84-804, 1987 WL 8592, at *5 n.8 (D. Minn. Apr. 1, 1987). Jurisdictions other than Minnesota have held a court may exercise personal jurisdiction over an individual out-of-state shareholder – as opposed to an out-of-state parent corporation – whose dominance and control establishes that a company with ties to the forum-state is simply the shareholder's alter ego. *E.g.*, *Lakota Girl Scout Council, Inc., v. Harvey Fund-Raising Mgm't Inc.*, 519 F.2d 634, 636-38 (8th Cir. 1975). *But see Stratasys, Inc. v. ProtoPulsion, Inc.*, No. 10-2257, 2011 WL 2750720, at *8 (Minn. Ct. App. July 18, 2011) (noting Minnesota courts have not yet adopted the practice of exercising personal jurisdiction over an individual shareholder based on an alter-ego theory). And, more importantly, the Minnesota Supreme Court has not addressed whether personal jurisdiction can be established based

---

[10] The *Victoria Elevator* factors include

insufficient capitalization for purposes of corporate undertaking, failure to observe corporate formalities, nonpayment of dividends, insolvency of debtor corporation at time of transaction in question, siphoning of funds by dominant shareholder, nonfunctioning of other officers and directors, absence of corporate records, and existence of corporation as merely facade for individual dealings.

283 N.W.2d at 512.

on an alter-ego theory in the reverse – over an out-of-state corporation based on an individual shareholder's in-state contacts.[11]

Assuming without deciding that the Court can have personal jurisdiction over an out-of-state corporation by virtue of an individual shareholder's in-state contacts, the Court must assess whether Acquisition subjected itself to jurisdiction in Minnesota by virtue of the Moyeses' in-state activities.  *See Scott v. Mego Int'l, Inc.*, 519 F. Supp. 1118, 1125-26 (D. Minn. 1981).  Receiver argues that under the *Victoria Elevator* factors, Acquisition is the Moyeses' alter ego because:  (1) Acquisition is a mere instrumentality used to hold the Moyeses' money; (2) Acquisition is insufficiently capitalized;

---

[11] The Court questions whether, as a general matter, alter-ego liability can occur under this approach.  The Amended Complaint seeks to hold Acquisition liable for the Moyeses' failure to repay First United because Acquisition is the Moyeses' alter ego.  (See Am. Compl. ¶¶ 192-93, 275-78.)  This type of veil piercing is generally known as "outside reverse piercing." *Lawrence Leasing, Inc. v. Northwoods Pallets, LLC*, No. 15-0360, 2016 WL 1081126, at *3 (Minn. Ct. App. Mar. 21, 2016) (quoting *Postal Instant Press, Inc. v. Kaswa Corp.*, 77 Cal. Rptr. 3d 96, 101 (Cal. Ct. App. 2008)).

In March 2016, the Minnesota Court of Appeals held in *Lawrence Leasing* that Minnesota – unlike California and Georgia – "has not adopted outside reverse piercing." *Id.* (citing *Postal Instant Press*, 77 Cal. Rptr. 3d at 101; *Acree v. McMahan*, 585 S.E.2d 873, 882 (Ga. 2003)).  In *Lawrence Leasing*, the district court applied outside reverse piercing and held two companies, Northwoods and NWP, liable for a majority shareholder's debts.  *Id.* at *1-2. Northwoods and NWP appealed, arguing the district court abused its discretion when it pierced the corporate veil.  *Id.* at *2.  The Minnesota Court of Appeals agreed that Northwoods and NWP could not be held liable for the majority shareholder's debts under an alter ego theory of liability. *Id.* at *3.

Similarly, in this case, Receiver seeks to hold Acquisition liable for the Moyeses' debt, arguing Acquisition is the alter ego of the Moyeses.  (Am. Compl. ¶¶ 192-93, 275-78).  Under the Minnesota Court of Appeals' *Lawrence Leasing* decision, veil piercing in this instance would be impermissible.  But "[t]his Court is not bound to follow the opinion of the Minnesota Court of Appeals."  *Nelson Distrib., Inc. v. Stewart-Warner Indus. Balancers*, 808 F. Supp. 684, 687 (D. Minn. 1992).  Because neither party addressed the issue of outside reverse piercing and Receiver failed to establish personal jurisdiction under the traditional approach, the Court declines to determine whether the Minnesota Supreme Court would agree with *Lawrence Leasing*.

(3) Acquisition has taken no actions since 2005 and simply holds a loan for the Moyeses; and (4) failure to pierce the corporate veil would result in injustice and fundamental unfairness to Receiver.

But, even if the *Victoria Elevator* factors show a corporation is an alter ego for liability purposes, there must also be an allegation of sufficient minimum contacts to give rise to personal jurisdiction. *See Hunter-Keith, Inc.*, 1987 WL 8592, at *5-6 & n.8 (noting the *Victoria Elevator* factors are part of the inquiry but also analyzing the actions the foreign entity took in Minnesota while acting through the alter-ego entity); *see also QA1 Precision Prods., Inc. v. Impro Indus. USA, Inc.*, No. 04-23, 2005 WL 1862324, at *4 (D. Minn. Aug. 4, 2005) (holding personal jurisdiction under Minnesota law requires the Court to "analyze whether the corporation [with in-state contacts] functioned as an instrumentality of the principals a party is attempting to reach by piercing the corporate veil"); *JL Schwieters Constr., Inc.*, 788 N.W.2d at 535-36 (noting the importance of the out-of-state company exerting substantial control over the LLC with in-state contacts and finding the out-of-state company "us[ed] the LLC as a conduit for its own business").

Thus, exercising personal jurisdiction is only appropriate if the out-of-state party "so controlled and dominated the affairs of the [party with in-state contacts] that the latter's corporate existence was disregarded so as to cause the [party with in-state contacts] to act as the [out-of-state party]'s alter ego." *Epps*, 327 F.3d at 649; *see also Lakota Girl Scout Council*, 519 F.2d at 637 ("Long-arm derivative jurisdiction over a foreign parent corporation has been found where the [out-of-state party] so controlled and dominated the activities of its resident subsidiary that the latter's separate corporate

existence was in effect disregarded."); *JL Schwieters Constr., Inc.*, 788 N.W.2d at 536 ("[T]he evidence was overwhelming that [the parent company] dominated and controlled the business and treated it as his [or her] own." (quoting *Lakota Girl Scout Council*, 519 F.2d at 638)).

Here, Receiver does not, and cannot, allege that Acquisition – the out-of-state company – so controlled and dominated the in-state activities of the Moyeses such that the Moyeses were acting as Acquisition's alter ego. *See Lakota Girl Scout Council*, 519 F.2d at 637. Specifically, there are no allegations that the Moyeses acted on behalf of Acquisition in their business dealings with Johnston or First United such that the Court can impute the Moyeses' in-state contacts to Acquisition.

Instead, Receiver sets forth numerous allegations that the Moyeses dominated and controlled the actions of Acquisition. But only one of Acquisition's actions directed by the Moyeses related, in any way, to Minnesota: Coolidge allegedly transferred proceeds from a loan it received from First United – the Minnesota contact – to Acquisition and Acquisition, at the behest of the Moyeses, transferred the First United loan proceeds to the Moyeses. (Am. Compl. ¶¶ 192, 272-74.) To the extent this transaction related to Minnesota, the Court finds this contact is too attenuated to confer personal jurisdiction. *See Burger King*, 471 U.S. at 474. Acquisition did not subject itself to jurisdiction in Minnesota by virtue of the Moyeses' in-state activities, by acting as an instrumentality of the Moyeses in their business dealings with First United, or through its own Minnesota contacts. *See JL Schwieters Constr., Inc.*, 788 N.W.2d at 535-36; *QA1 Precision Prods.*,

*Inc.*, 2005 WL 1862324, at *4.  Thus, Receiver failed to show the Court should disregard Acquisition's corporate form and exercise personal jurisdiction.

For this reason, the Court finds it lacks personal jurisdiction over Acquisition and will grant Acquisition's motion to dismiss for lack of personal jurisdiction.

## II.    SUMMARY JUDGMENT

### A.    Standard of Review

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party can demonstrate it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the lawsuit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences to be drawn from those facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).  Summary judgment is appropriate if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "To defeat a motion for summary judgment, a party may not rest upon allegations, but must produce probative evidence sufficient to demonstrate a genuine issue [of material fact] for trial."  *Davenport v. Univ.*

*of Ark. Bd. of Trs.*, 553 F.3d 1110, 1113 (8ᵗʰ Cir. 2009) (citing *Anderson*, 477 U.S. at 247-49).

### B.   Count 2 (Aiding and Abetting Breach of Fiduciary Duty)

The Moyes parties first move for summary judgment on Receiver's Aiding and Abetting Breach of Fiduciary Duty Claim.  To prove its claim, Receiver must show: "(1) [First United] . . . commit[ed] a tort that cause[d] an injury to [the participant banks]; (2) the defendant[s] [knew] that [First United's] conduct constitute[d] a breach of duty; and (3) the defendant[s] . . . substantially assist[ed] or encourage[d] [First United] in the achievement of the breach." *Witzman v. Lehrman, Lehrman & Flom*, 601 N.W.2d 179, 187 (Minn. 1999).  Receiver must also show a fiduciary duty existed between First United and the participant banks.  *See Varga v. U.S. Bank Nat'l Ass'n*, 952 F. Supp. 2d 850, 855 (D. Minn. 2013) ("It is axiomatic that liability for **aiding and abetting** a breach of fiduciary duty cannot exist without an **underlying** breach of that duty.").

The Moyes parties argue Receiver failed to raise a genuine issue of material fact regarding the existence of a fiduciary relationship between Johnston/First United and the participant banks.  To support their claim, the Moyes parties cite a series of cases where courts held banks who participate in loans together do not owe each other fiduciary duties absent unequivocal contract language.  *See, e.g.*, *First Citizens Fed. Sav. & Loan Ass'n v. Worthen Bank & Tr. Co.*, 919 F.2d 510, 514 (9ᵗʰ Cir. 1990); *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank*, 731 F.2d 112, 122 (2d Cir. 1984); *Nat'l Minority Supplier Dev. Council Bus. Consortium Fund Inc. v. Hessian & McKasy, P.A.*, No. 04-1670, 2005 WL

3526587, at *6-7 (D. Minn. Dec. 22, 2005) (applying Minnesota law). These courts reasoned that "[i]n the context of loan participation agreements among sophisticated lending institutions, . . . fiduciary relationships should not be inferred . . . . [because] [b]anks and savings institutions engaged in commercial transactions normally deal with one another at arm's length and not as fiduciaries." *First Citizens*, 919 F.2d at 514.

Receiver responds noting that, under Minnesota law, "agents" owe fiduciary duties to their principals. *See, e.g.*, *Witt v. John Blomquist, Inc.*, 81 N.W.2d 265, 266 (Minn. 1957). Receiver highlights that First United's standard participation agreement authorized First United "to generally act as **agent** for all Participants." (Second Finn Decl., Ex. U § 2.2 (emphasis added).) Accordingly, Receiver argues a fact issue remains regarding the existence of a fiduciary relationship and, as such, the Court should deny the Moyes parties' motion for summary judgment.

The existence of a fiduciary relationship is generally a question of fact. *Minn. Timber Producers Ass'ns v. Am. Mut. Ins. Co. of Bos.*, 766 F.2d 1261, 1268 (8th Cir. 1985). But "[t]he court is not precluded . . . from resolving the issue on summary judgment if the undisputed facts establish that no fiduciary duty exists." *H Enters. Int'l, Inc. v. Gen. Elec. Capital Corp.*, 833 F. Supp. 1405, 1422 (D. Minn. 1993).

In *National Minority*, a court in this district addressed the question of whether a fiduciary relationship exists under Minnesota law between two sophisticated commercial lending institutions absent express contractual language to the contrary. 2005 WL 3526587, at *6-7. There, a lead bank (Windsor) entered into a participation agreement with a participant bank (BCF) to extend loans to a third-party borrower. *Id.* at *1. Under

the terms of the participation agreement, Windsor agreed "to act as trustee of the Loan Documents on behalf of the BCF and **as the agent** in collection of the Participation Interest of the BCF in the Loan." *Id.* (emphasis added). The borrower ultimately engaged in an embezzlement scam and a series of lawsuits ensued. *Id.* at *1-2. BCF filed a complaint alleging breach of fiduciary duty against Windsor under the participation agreement. *Id.* at *4. Windsor moved for summary judgment, arguing that, even though Windsor was called an "agent" in the participation agreement, Windsor did not owe a fiduciary duty to BCF because "in the context of loan participation agreements among sophisticated lending institutions, fiduciary relationships should not be inferred absent unequivocal contractual language." *Id.* at *6 (citing *First Citizens*, 919 F.2d at 514). The Court agreed, finding that

> nothing in the Agreement indicated that Windsor owed a fiduciary duty to BCF. The fact that the Agreement indicate[d] that [Windsor was] to 'act as trustee of the Loan Documents on behalf of the BCF and as the agent in collection of the Participation Interest of the BCF in the Loan' d[id] not create a fiduciary duty.

*Id.*

The Court's holding in *National Minority* is consistent with Eighth Circuit precedent applying the law of other jurisdictions. *See, e.g.*, *BancorpSouth Bank v. Hazelwood Logistics Ctr., LLC*, 706 F.3d 888, 895 n.3 (8th Cir. 2013) (noting in a case applying Missouri law that even though the Court was comparing "the participation agreement to a business trust for purposes of jurisdiction, [the Court] in no way impl[ied] the agreement created a fiduciary relationship between the bank and the participants"); *Nw. Bank & Tr. Co. v. First Ill. Nat'l Bank*, 354 F.3d 721, 727 (8th Cir. 2003) ("[W]e

believe that the district court correctly discerned that . . . the Iowa Supreme Court would not recognize the existence of a fiduciary relationship between two sophisticated commercial lending institutions absent express contractual language to the contrary."); *see also LNV Corp. v. Outsource Serv. Mgmt., LLC*, No. 13-1926, 2014 WL 5106866, at *11 (D. Minn. Oct. 10, 2014) (applying New York law and finding "[b]anks who participate in loans together are not fiduciaries, but act at arm's length . . . . Any fiduciary duties between banks participating in a loan must be created by 'unequivocal language' in the Participation Agreement" (quoting *330 Acquisition Co. v. Regency Sav. Bank*, 306 A.D.2d 154, 155 (N.Y. App. Div. 2003))).

In light of the precedent in *National Minority*, coupled with similar cases arising from the Eighth Circuit, the Court finds that while an "agent" generally owes a fiduciary duty under Minnesota law, the Minnesota Supreme Court would not recognize the existence of a fiduciary relationship between two sophisticated commercial lending institutions absent express contractual language to the contrary. *See* 2005 WL 3526587, at *6-7. The parties do not dispute that while the participation agreement between First United and the participant banks outlined a limited duty of care and called First United an "agent," the participation agreement does not explicitly discuss fiduciary duties between First United and the participant banks.[12] (Second Finn Decl., Ex. U §§ 2.2 (relationship

---

[12] The Minnesota Court of Appeals previously concluded First United acted as an agent on behalf of nonresident banks for the purpose of personal jurisdiction. *See Finn v. Walworth State Bank*, No. 11-2334 *et al.*, 2013 WL 6389521, at *12 (Minn. Ct. App. Dec. 9, 2013). But the existence of an agency relationship for the purpose of personal jurisdiction does not, itself, imply the creation of a fiduciary relationship. *See BancorpSouth Bank*, 706 F.3d at 895 n.3.

of the parties), 5.3 (duty of care)); *see also First Citizens*, 919 F.2d at 514 (holding no fiduciary duty existed where the agreement obligated the lead bank to administer the loan with the same degree of care that the lead bank would exercise in servicing the loan on its own account). Therefore, there is no genuine issue of material fact regarding the existence of a fiduciary relationship and the Court will grant the Moyes parties' motion for summary judgment on Count 2.

### C.  Count 3 (Avoidance of Fraudulent Transfers)

Receiver first moves for summary judgment on its Avoidance of Fraudulent Transfer claim pursuant to Minn. Stat. § 513.44(a)(1) (2014).[13]  Under section 513.44(a),

> [a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation . . . with actual intent to hinder, delay, or defraud any creditor of the debtor[.]

"Because the intent to defraud creditors is rarely susceptible of direct proof, courts continue to rely on 'badges of fraud' to determine whether a transfer is fraudulent." *Citizens State Bank Norwood Young Am. v. Brown*, 849 N.W.2d 55, 60 (Minn. 2014). In general, the existence of fraudulent intent is a question of fact, but, on summary judgment a district court may decide the question as a matter of law "when no genuine issue of material fact exists." *Id.* at 65.

---

[13] The Minnesota Legislature amended the Minnesota Uniform Transfer Act in 2015, renaming it the Uniform Voidable Transactions Act. 2015 Minn. Sess. Law Serv., ch. 17 (West) (to be codified at Minn. Stat. §§ 513.41-.51). But the modifications only apply to "a transfer made or an obligation incurred on or after August 1, 2015." *Id.* § 13. The transactions at issue, therefore, fall under the previous version of the statute. (*See* Am. Compl. ¶ 227.)

To assess whether a genuine issue of material fact exists with respect to fraudulent intent, the Court may consider, "among other factors," whether: (1) the transfer was to an insider; (2) the debtor retained control of the property transferred after the transfer; (3) the transfer was disclosed; (4) before the transfer was made the debtor was sued or threatened with suit; (5) the transfer was of substantially all of the debtor's assets; (6) the debtor absconded; (7) the debtor removed or concealed assets; (8) the value of the consideration the debtor received was reasonably equivalent to the value of the assets transferred; (9) the debtor was insolvent or became insolvent shortly after the transfer occurred; (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor. Minn. Stat. § 513.44(b)(1)-(11). "The presence of several badges of fraud . . . creates an inference of fraud that requires clear evidence of a legitimate purpose to rebut." *Citizens State Bank*, 849 N.W.2d at 66.

Receiver argues no genuine issues of material fact remain related to its fraudulent transfer claim. Receiver asserts the record shows Coolidge transferred to Jerry Moyes $2,711,577 in funds that belonged to First United. (Finn Decl., Exs. X, BB.) As such, according to Receiver, the funds were improperly transferred to Jerry Moyes instead of First United with the intent to defraud the participant banks. (*See id.*, Exs. AA-BB.) In addition, Receiver indicates that the following badges of fraud prove, as a matter of law, that the transfer was made with actual intent to defraud the participant banks: (1) Johnston's admission that in 2005 – the time the $2,711,557 transfer was made – he was "knowingly and intentionally" engaging in a scheme "to defraud and to obtain funds

from federally insured banks" (*id.*, Ex. F);[14] (2) First United's (or Coolidge's) insolvency

at the time of the transfer (*id.* ¶ 41 & Ex. GG at 4-9); (3) the existence of a lawsuit

between the Moyeses and Miller around the time of the transfer (*id.*, Exs. I, Z); (4) the

failure of Coolidge or the Moyeses to disclose the $2,711,557 transfer to First United's

creditors (*id.* ¶ 42); (5) Jerry Moyes's failure to provide value to First United in exchange

for the transfer; (6) the fact that the Moyeses were "insiders" of Coolidge (*id.* ¶ 29); and

(7) certain admissions made during the course of this litigation related to the $2,711,557

transaction and Johnston's fraudulent conduct (Answer to Am. Compl. ¶ 27, Mar. 7,

2016, Docket No. 112; Decl. of Patrick Finn in Supp. of Receiver's Reply ("Fourth Finn

Decl."), Ex. B at 5, Aug. 12, 2016, Docket No. 184; Finn Decl., Ex. AA).

---

[14] Receiver asserts Johnston's admissions as part of his plea are "direct proof" of fraudulent intent regarding the transfer from Coolidge to Jerry Moyes. As Defendants point out, however, any fraudulent transfer that occurred was an "indirect transfer" because Coolidge – a company in which the Moyeses and Miller had an interest – made the transaction to Jerry Moyes and not First United. Thus, the Court must determine whether the record shows no genuine issue of material fact that the transaction between Coolidge and Jerry Moyes was committed with actual fraud. For this reason, while Johnston's admissions at the plea hearing may be evidence of an actual intent to defraud the participant banks, the admission is not dispositive.

Along the same line, Defendants argue that because the relevant transaction occurred between Coolidge and Jerry Moyes, Receiver lacks standing to assert a fraudulent transfer claim. But, interpreting the Uniform Fraudulent Transfer Act, the Eighth Circuit has held "[a]n indirect transfer occurs when the debtor surrenders an asset or interest to a third party for the ultimate benefit of the alleged transferee." *Kaler v. Craig* (*In re Craig*), 144 F.3d 587, 592 (8th Cir. 1998). Here, Receiver alleges the debtor (Johnston/First United) loaned money to a third party (Coolidge) for the ultimate benefit of the transferee (the Moyeses). Thus, in light of the broad interpretation of the word "transfer" under the Uniform Fraudulent Transfer Act, Receiver has standing to bring the claim. (Finn Decl., Ex. C at 23 (authorizing Receiver to "pursue any and all claims that First United or Receiver may have against any third party").)

The Moyes parties rebut Receiver's evidence of badges of fraud, noting: (1) the Moyeses had little involvement with Coolidge (Evans Decl. ¶ 6);[15] (2) the transfer from Coolidge to the Moyeses occurred under the direction of a now-deceased project manager (Aff. of Douglas L. Elsass in Opp. to Pl.'s Mot. for Partial Summ. J. ("Elsass Aff."), Ex. G at 17:16-18, 66:14-22, July 22, 2016, Docket No. 173; *id.*, Ex. G at PF86429 ("Grant Lane (deceased)")); (3) Coolidge made the $2,711,557 transfer to the Moyeses as part of the Moyeses' settlement with Miller – evidencing the money was not an asset of

---

[15] Receiver makes several arguments that the Court should disregard Aaron Evans's Declaration. First, Receiver argues Evans has no basis to provide testimony regarding Coolidge because Evans was not involved in Coolidge's accounting or taxes and Evans is not an expert. Reviewing the declaration, to the extent the Moyes parties attempt to use Evans's declaration as a rebuttal expert opinion, the Court gives little weight to Evans's opinions. That being said, Evans has some personal knowledge regarding Coolidge as it relates to the transactions between Coolidge and the Moyeses – Evans was, after all, the Moyeses accountant and tax preparer. (Evans Decl. ¶ 2.) Thus, there is no reason for the Court to disregard Evans's statements about Coolidge that are based on Evans's personal knowledge.

Receiver next argues the Court should disregard Evans's declaration because it is premised on the Moyeses' receipt of two transfers from Coolidge, not three. Receiver correctly points out that Jerry Moyes admitted three transfers occurred on August 25, 2005. (*See* Fourth Finn Decl., Ex. B at 5.) It is also true Evans's declaration only speaks to the two transactions. But, as stated above, the Court may consider the facts based on Evans's personal knowledge.

Finally, Receiver argues Evans's declaration is a "sham affidavit" and should be disregarded in its entirety. Specifically, Receiver asserts Evans's declaration is a "sham" because it contradicts his prior deposition testimony that he "did not know" anything about the transfer. *See, e.g.*, *City of St. Joseph v. Sw. Bell Tel.*, 439 F.3d 468, 476 (8th Cir. 2006). Evans did repeatedly answer questions regarding the $2,711,557 transfer in his deposition by stating "I don't know." (Evans Decl., Ex. A at 98:12-17, 100:10-18, 111:13-112:20; 119:13-22.) But, as stated in Evans's declaration, after Receiver provided Evans certain documents regarding the $2,711,557 transfer, Evans provided explicit testimony regarding his recollection of the transfer. (Evans Decl. ¶ 7 & Ex. A at 110:8-120:14.) Thus, while Evans's declaration provided additional information not discussed during the deposition, the declaration is not directly contradictory and, instead, clarifies his prior testimony. *Ladd v. Mohawk Carpet Distribution, L.P.*, No. 08-6470, 2010 WL 2541651, at *4 (D. Minn. Apr. 1, 2010), *adopted by* No. 08-6470, 2010 WL 2540702 (D. Minn. June 17, 2010) ("If the ensuing affidavit is not directly contradictory, or if it only restates or clarifies prior testimony, then it is properly part of the record on summary judgment.").

First United (Evans Decl. ¶¶ 3-22; Finn Decl., Ex. Z § 3.1); and (4) Coolidge was solvent when it made the $2,711,557 transfer (Evans Decl. ¶¶ 23-25; Elsass Aff., Ex. J).

Ultimately, Receiver does produce evidence to support the presence of certain badges of fraud. Unlike *Citizens State Bank*, however, the record does not "establish" these badges of fraud amount to conclusive evidence of fraudulent intent as a matter of law. 849 N.W.2d at 62-63. Arguably, Receiver has established Coolidge and First United were insolvent in August 2005. (*See* Finn Decl., Ex. GG (unrebutted expert report regarding solvency of Coolidge).) But issues of fact remain regarding the Moyeses' involvement with Coolidge (*compare* Finn Decl. ¶ 29, *with* Evans Decl. ¶ 6), and whether the transfer involved First United's money, thereby requiring disclosure to creditors or value to be paid to First United (Evans Decl. ¶¶ 3-22; Finn Decl., Ex. Z § 3.1).

Further, even if Receiver established certain badges of fraud as a matter of law, summary judgment is improper if the Moyes parties set forth evidence of a legitimate purpose. *Citizens State Bank*, 849 N.W.2d at 66. Here, the Moyes parties presented evidence the $2,711,557 transfer was part of the settlement agreement between Miller and the Moyeses. (Finn Decl., Ex. Z § 3.1.) According to the Moyes parties, the $2,711,557 transfer was a return on the ownership interest formerly held by Miller and held by Jerry Moyes on the day of the transfer. (Evans Decl. ¶ 5.) Thus, a fact issue remains regarding whether the $2,711,557 transfer occurred because of a legitimate purpose or actual fraud.

For these reasons, the Court will deny Receiver's motion for summary judgment on Count 3.

### D.      Count 8 (Breach of the MJV-FUF4 and MJV-FUF6 Guarantees)

Receiver next seeks summary judgment on its claim against the Moyeses and the

Moyes Family Trust for breach of the MJV-FUF4 and MJV-FUF6 guarantees.   The

Moyes parties contest the motion and cross-move for summary judgment in their favor on

the MJV-FUF6 guarantee.

In an action for breach of contract, including a guarantee, the elements of a

successful claim are:

> (a) the formation of the contract; (b) performance by plaintiff of any
> conditions precedent to his right to demand performance by defendant; and
> (c) a breach of the contract by defendant.  These elements of the cause of
> action are the fundamental propositions which plaintiff must prove in order
> to establish a right of recovery.

*Briggs Transp. Co. v. Ranzenberger*, 217 N.W.2d 198, 200 (Minn. 1974).  As relevant to

the claims underlying the MJV-FUF4 and MJV-FUF6 guarantees, the Restructuring

Agreement provides "[i]f **enforceable** guarant[ees] **executed** by [the Moyeses and the

Moyes Family Trust] of any of the loans made by First United to Midtown . . . commonly

referred to as loans MJV-FUF4 [and] MJV-FUF6 . . . are **presented** to [the Moyeses and

Moyes Family Trust], [the Moyeses and Moyes Family Trust] shall honor such

guarant[ees]."  (Finn Decl., Ex. N § 9(z) (emphasis added).)

### 1.   MJV-FUF6 Guarantee

Receiver argues it is entitled to summary judgment on its claim regarding breach of the MJV-FUF6 guarantee.  Receiver bases its argument, primarily,[16] on extrinsic evidence that the Moyeses signed the MJV-FUF6 guarantee.  The Moyes parties contest Receiver's motion for summary judgment and cross-move for summary judgment regarding the MJV-FUF6 guarantee.  The Moyes parties argue section 9(z) in the Restructuring Agreement governs the enforceability of the MJV-FUF6 guarantee and, because the record plainly shows the conditions of section 9(z) are not met, the Moyes parties are entitled to summary judgment.

The viability of the MJV-FUF6 claim rests on whether the Restructuring Agreement governs the enforceability of the guarantee.  The Moyes parties allegedly signed the MJV-FUF6 guarantee on September 28, 2007.  (*Id.* ¶ 18.)  In June 2010, after Johnston's Ponzi scheme collapsed, the Moyeses and the Moyes Family Trust signed the Restructuring Agreement to restructure their indebtedness to First United arising out of the Midtown loans.  (*Id.*, Ex. N.)  Part of the "benefits from the restructuring of [the Moyeses' loans], include[ed], without limitation . . . [that] litigation that would result in

---

[16] Receiver also argues the terms of MJV-FUF4 include the MJV-FUF6 guarantee and, therefore, the Moyes parties are required to guarantee repayment under MJV-FUF6.  The MJV-FUF4 guarantee is a standard form guarantee First United used for all its guarantees with the Moyeses.  The terms of the MJV-FUF4 guarantee provide that the agreement guaranteed "full and prompt payment when due" of "each and every other of the obligations in connection with the Loan or sum now or hereafter owing under **any agreement now or hereafter entered into between Lender and Borrower in connection with the Loan or the Property encumbered therein**."  (Fourth Finn Decl., Ex. A at 44697 (emphasis added).)  But, for the reasons stated below, the terms of the Restructuring Agreement govern the MJV-FUF4 guarantee.  Thus, the inclusive language in the MJV-FUF4 guarantee does not relieve Receiver of the requirement to present an executed copy of the MJV-FUF6 guarantee.

foreclosure and collection on" the Moyeses' existing First United loans would be "prevented." (*Id.*, Ex. N § T.)

The parties included in the Restructuring Agreement a section regarding loans, including MJV-FUF6, for which some evidence indicated the Moyeses had guaranteed the loans, but executed copies of the guarantee agreements could not be found. (*Id.* ¶ 18 & Ex. N § 9(z).) As stated above, the Restructuring Agreement provides that "[i]f [an] enforceable guarantee **executed by** [the Moyeses and the Moyes Family Trust] of . . . loan[] MJV-FUF6 . . . [is] **presented to** [the Moyeses and the Moyes Family Trust]" then the guarantee will be honored. (*Id.*, Ex. N § 9(z) (emphasis added).)

Receiver now seeks summary judgment on the MJV-FUF6 loan, acknowledging that it cannot locate the guarantee. Instead, Receiver argues it is not bound by the terms in section 9(z) and can, instead, seek all legal remedies under the terms of the original guarantee. To support its assertion, Receiver cites section 14 of the Restructuring Agreement, which states: "The remedies herein and in any other instrument, document or agreement delivered or to be delivered to [Receiver] hereunder or in connection herewith are **cumulative** and **not exclusive** of any remedies provided by law." (*Id.* § 14 (emphasis added); *see also id.* § 28 ("The Borrower acknowledges and agrees that this Agreement does not constitute waiver of any right of [Receiver] to insist on strict

compliance by [the Moyeses and the Moyes Family Trust] with each and every term, condition and covenant of the Loan Documents."[17]).)

But Receiver's interpretation is contrary to the plain terms of the Restructuring Agreement.  Part of the consideration Receiver provided to enter into the Restructuring Agreement was to "prevent[]" "litigation that would result in . . . collection."  (*Id.*, Ex. N § T.)  Further, the Restructuring Agreement has no meaning if it does not modify terms that conflict with the existing loans.  (*See id.* § 18 ("[T]his Agreement supersedes all prior agreements and understandings relating to **the subject matter hereof** . . . ." (emphasis added)).)  Thus, while the language of the Restructuring Agreement may not limit the **remedies** available to Receiver, it does limit the circumstances in which Receiver can show breach of the MJV-FUF6 guarantee.  Specifically, Receiver can only show breach of the guarantee if it first "presented" an "executed" and "enforceable" guarantee.  (*Id.* § 9(z).)

Receiver argues that, even if the terms of the Restructuring Agreement control, the record proves execution of an agreement.  To support this claim, Receiver points to the following evidence:  (1) Jerry Moyes's testimony that he signed and delivered the MJV-FUF6 guarantee (*id.*, Ex. V); (2) the Moyeses' internal records showing Jerry Moyes guaranteed the MJV-FUF6 loan (*id.*, Exs. R-T); and (3) the general practice between First United and the Moyeses regarding the Midtown loans (*id.* ¶ 14 & Ex. L).

---

[17] The term "Loan Documents" in the Restructuring Agreement is a defined term that may not include MJV-FUF4 and MJV-FUF6, (*see* Finn Decl., Ex. N, §§ K, O, 7(c)), but, in any case, provides context for the intention of the parties when signing the Restructuring Agreement.

A fact issue may very well exist regarding whether Jerry Moyes signed the MJF-FUF6 guarantee.  But section 9(z) of the Restructuring Agreement requires more than just execution.  Section 9(z) also mandates that Receiver "present[]" an executed copy of the MJF-FUF6 guarantee to the Moyeses and the Moyes Family Trust.  (*Id.*, Ex. N § 9(z).)

Under general principles of contract law, "presentment" requires "[t]he formal **production** of a negotiable instrument . . . for payment."  *Presentment*, Black's Law Dictionary (10ᵗʰ ed. 2014) (emphasis added).  While section 9(z) does not provide a specific means for presentment, the Restructuring Agreement plainly requires Receiver to produce an executed copy of the MJV-FUF6 guarantee to the Moyeses and the Moyes Family Trust.  Nothing in the record shows that any kind of presentment of an executed copy of the MJV-FUF6 guarantee.  In fact, Receiver admits discovery did not produce an executed copy of the MJV-FUF6 guarantee for Receiver to present.  For this reason, the Court will deny Receiver's motion for summary judgment and grant the Moyes parties' motion for summary judgment on Count 8 as it relates to MJV-FUF6.

### 2.    MJV-FUF4 Guarantee

Receiver also asserts it is entitled to summary judgment on its claim alleging the Moyeses and the Moyes Family Trust breached the MJV-FUF4 guarantee.  Receiver argues no genuine issues of material fact remain regarding this claim.

The Moyes parties contest Receiver's motion and argue Receiver is not entitled to summary judgment because the record does not show Receiver "presented" an "enforceable guarantee[] executed by" the Moyeses and the Moyes Family Trust.

Instead, the Moyes parties assert the first time Receiver demanded payment under the MJV-FUF4 guarantee was in Receiver's summary judgment memorandum.[18]   Receiver responds that it made clear demands for payment when it filed its claim for breach of the MJV-FUF4 guarantee in this lawsuit and also when a lawyer handed Jerry Moyes a copy of the executed MJV-FUF4 guarantee during his deposition, (*see* Decl. of Ellen Penrod ("Penrod Decl.") ¶ 4, July 22, 2016, Docket No. 175 (indicating presentment occurred on the date of Jerry Moyes's deposition)).

As articulated above, section 9(z) of the Restructuring Agreement requires Receiver to "present" an executed copy of the MJV-FUF4 guarantee to the Moyeses and the Moyes Family Trust.   But section 9(z) does not provide a specific method of presentment or require presentment to occur prior to Receiver filing a lawsuit.   *See* 22 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 60:64 (4th ed. 2015).

While Receiver did not present the MJV-FUF4 guarantee prior to litigation, Receiver certainly made a demand for payment by filing the lawsuit (*see* Notice of Removal, Attach. 1; Fourth Finn Decl. ¶ 1 & Ex. A), and the Moyes parties concede Receiver provided Jerry Moyes a copy of the MJV-FUF4 guarantee at his deposition, (Penrod Decl. ¶ 4 (indicating a "presentment date" of September 23, 2015 – the date of Jerry Moyes's deposition).   Thus, the record establishes Receiver complied with the

---

[18] Defendants also argue a fact issue remains on the enforceability of the MJV-FUF4 guarantee because the MJV-FUF4 guarantee in the record is not signed by the other guarantors. But Receiver presents evidence that Defendants' own files contain executed MJV-FUF4 contracts signed by all of the guarantors. (*See* Fourth Finn Decl. ¶ 1 & Ex. A at 44701, 44706.)

terms of section 9(z) to require payment from the Moyes parties under the MJV-FUF4 guarantee. To interpret the Restructuring Agreement to permit the Moyes parties to avoid their obligation because the lawsuit was filed prior to Receiver presenting an executed copy of the MJV-FUF4 guarantee is inconsistent with the overall purpose of the Restructuring Agreement and section 9(z) in particular.

Receiver satisfied the terms of section 9(z) and, therefore, the Court must analyze whether Receiver is entitled to summary judgment for breach of the MJV-FUF4. The record shows: (1) the Moyeses and the Moyes Family Trust executed the MJV-FUF4 guarantee (Finn Decl., Ex. P); (2) First United made the loan guaranteed by the MJV-FUF4 to Midtown (*id.* ¶ 18); (3) Midtown failed to pay the principal balance on the loan or any accrued interest (*id.* ¶ 38); (4) the Moyeses and the Moyes Family Trust are obligated for Midtown's failure to pay under the terms of the guarantee (*id.*, Ex. K at 84:4-15 (Burdette testimony that MJV-FUF4 is enforceable); *id.*, Ex. N § 9(z) (Restructuring Agreement regarding MJV-FUF4); *id.*, Ex. P (MJV-FUF4 guarantee)); and (5) the Moyeses' and the Moyes Family Trust's failure to pay under the terms of the guarantee damaged First United. Thus, no fact issue remains regarding the Moyeses' and the Moyes Family Trust's liability for breach of the MJV-FUF4 guarantee.

For these reasons, the Court will grant Receiver's motion for summary judgment regarding Count 8 alleging breach of the MJV-FUF4 guarantee.[19]

---

[19]Questions of fact remain over the calculation of the amount owed under the terms of the Restructuring Agreement and MJV-FUF4. (*Compare* Finn Decl., Ex. DD, *with* Penrod Decl., Ex. A.) The Court, therefore, grants summary judgment only with respect to breach of the MJV-FUF4.

### E.    Count 9 (Unjust Enrichment)

The Court must next assess whether the Moyes parties are entitled to summary judgment on Receiver's unjust enrichment claim.  The Moyes parties argue Receiver's unjust enrichment claim fails because, under Minnesota law, an unjust enrichment claim "is not available where there is an adequate legal remedy or where statutory standards for recovery are set by the legislature."  *United States v. Bame*, 721 F.3d 1025, 1030 (8th Cir. 2013) (quoting *Southtown Plumbing, Inc. v. Har-Ned Lumber Co.*, 493 N.W.2d 137, 140 (Minn. Ct. App. 1992)).  Receiver asserts its claim does not fail as a matter of law because it is entitled to pursue unjust enrichment as an alternative claim until Receiver succeeds on one or more of its related legal and statutory claims.

In *Bame*, the Eighth Circuit extensively discussed Minnesota law on this issue in dicta.  721 F.3d at 1029-32.  In that case, the government admitted it pled adequate legal remedies along with a claim of unjust enrichment.  *Id.* at 1030-31.  The government argued the body of caselaw stating "unjust enrichment recovery may not be had where a party has an adequate legal remedy" did not restrain the government from "pleading and pursuing unjust enrichment and the adequate legal remedies simultaneously."  *Id.* at 1031.  The government asserted "a party is only precluded from recovering under a theory of unjust enrichment if it failed to pursue the existing adequate legal remedy at law."  *Id.*  The Eighth Circuit noted that "some district courts [have been] unwilling to dismiss an unjust enrichment claim at the pleading stage despite the existence of an adequate legal remedy, because the federal rules allow for the pleading of claims in the

alternative." *Id.* (citing *United States v. R.J. Zavoral & Sons, Inc.*, 894 F. Supp. 2d 1118, 1127 (D. Minn. 2012); *Marty H. Segelbaum, Inc. v. MW Capital, LLC*, 673 F. Supp. 2d 875, 880 (D. Minn. 2009)). But the Eighth Circuit questioned whether the same principle should apply at the summary judgment stage, when "the issue . . . is not one of pleading." *Id.* The Eighth Circuit went on to state that "despite courts' occasional emphasis of the failure to pursue a legal remedy, it is the **existence of an adequate legal remedy that precludes unjust enrichment recovery**." *Id.* (emphasis added). Thus, concluded the Eighth Circuit, "[d]istrict courts routinely dismiss unjust enrichment claims where the plaintiff pleaded and pursued both equitable and legal claims simultaneously, as well as where the plaintiff failed to pursue adequate legal remedies." *Id.* (citing *In re Viagra Prods. Liab. Litig.*, 658 F. Supp. 2d 950, 968-69 (D. Minn. 2009)).

Similarly, here, Receiver argues it is entitled to continue to pursue its unjust enrichment claim – past the pleading stage – in spite of its admission that adequate legal remedies exist. Specifically, Receiver argues the Moyes parties were unjustly enriched by the $2,711,557 Coolidge transfer and the Moyes parties' breach of the MJV-FUF4 and MJV-FUF6 guarantees. To recover from these alleged injuries, Receiver brought a statutory claim pursuant to Minn. Stat. § 513.44(a)(1) to recover the loss from the Coolidge transfer (Am. Compl. ¶¶ 226-37) and a breach of contract claim regarding the MJV-FUF4 and MJV-FUF6 guarantees (*id.* ¶¶ 280-86). Thus, at this stage, Receiver's unjust enrichment claim is "merely duplicative" of its legal claims. *See Select Comfort Corp. v. Baxter*, 156 F. Supp. 3d 971, 994 (D. Minn. 2016) (granting summary judgment

because adequate legal remedy existed); *Damon v. Groteboer*, 937 F. Supp. 2d 1048, 1085-86 (D. Minn. 2013) (same).

Receiver asserts the duplicative nature of the claims is irrelevant because the Moyes parties contest the legal claims.  Thus, according to Receiver, it is entitled to continue to pursue unjust enrichment as an alternative remedy until Receiver recovers on its legal claims.  But the Eighth Circuit recently weighed in on the theory, holding that even though a plaintiff does not **prevail** on a legal claim, an unjust enrichment award could not survive because "an adequate legal remedy was ***available***."  *Ventura v. Kyle*, 825 F.3d 876, 887 n.10 (8th Cir. 2016) (emphasis added).  Thus, even if Receiver does not prevail on its legal claims regarding the Coolidge transfer and the MJV-FUF4 and MJV-FUF6 guarantees, Receiver would still not be entitled to unjust enrichment damages because legal remedies are **available** to Receiver.  *See id.*

Therefore, the Court will grant Defendant's motion for summary judgment on Count 9.

## III.    DAMAGES

Finally, the Moyes parties argue the Court should find, as a matter of law, that Receiver is precluded from re-litigating the issue of damages because a state court already approved a damages calculation for the participant banks' claims and entered judgment.  The Moyes parties argue the doctrine of collateral estoppel – also known as

issue preclusion – bars Receiver from recovering damages over approximately $9 million.[20]

> In Minnesota, a court appropriately applies collateral estoppel where:
>
> (1) the issue was identical to one in a prior adjudication; (2) there was a final judgment on the merits; (3) the estopped party was a party or in privity with a party to the prior adjudication; and (4) the estopped party was given a full and fair opportunity to be heard on the adjudicated issue.

*Willems v. Comm'r of Pub. Safety*, 333 N.W.2d 619, 621 (Minn. 1983) (quoting *Victory Highway Vill., Inc. v. Weaver*, 480 F. Supp. 71, 74 (D. Minn. 1979)).  Here, the only contested element of collateral estoppel is whether the issue of damages presented to the state court was "identical" to the issue of damages in this case.  Receiver's response to the Moyes parties' collateral estoppel argument differs depending on the entity whose interest – that of the participant banks or First United – Receiver seeks to promote through a given claim.[21]

---

[20] The $9 million calculation derives from damages judgment issued by the Dakota County District Court in the amount of approximately $91 million, less the amount Receiver recovered for the participant banks (to date more than $81 million), for an amount owing on the original damages judgment of $9 million.  (*See* Johnson Aff., Ex. 1 at 12, *id.*, Ex. 4 at 9, *id.*, Ex. 9 at 406; Second Elsass Aff., Ex A.)

[21] Receiver concedes it brought Counts 1 and 2 solely on behalf of the participant banks. But Receiver contests that it brought Counts 3 through 5 solely on behalf of the participant banks.  Receiver's argument belies the plain language of the Complaint.  (*See* Am. Compl. ¶¶ 228-29 (Count 3 stating First United and Johnston fraudulently transferred money to damage First United's and Johnston's creditors); *id.* ¶¶ 240-41 (same for Count 4); *id.* ¶¶ 251-52 (same for Count 5).)  Receiver also contests that the unjust enrichment claim (Count 9) was brought solely on behalf of the participant banks, but the Amended Complaint plainly states that "Receiver is entitled to recover damages for the **Victim Participants**" and makes no claim regarding First United.  (*See id.* ¶ 294 (emphasis added).)  Thus, the Court finds Receiver brought Counts 1-5 and Count 9 solely on behalf of the participant banks.

With respect to claims where Receiver seeks damages on behalf of the participant banks, Receiver first argues damages for "aiding and abetting" are not the same as damages for the underlying Ponzi scheme.  Receiver contends that, under Minnesota law, damages are available for aiding and abetting fraud to the extent necessary to "fully compensate the victims."  *See Popp Telecom v. Am. Sharecom, Inc.*, 210 F.3d 928, 936 (8th Cir. 2000).  But aiding and abetting claims "are contingent on a finding" that the primary actor committed a tort.  *Rucki v. Grazzini*, No. 09-0694 *et al.*, 2010 WL 1286725, at *7 (Minn. Ct. App. Apr. 6, 2010); *see also Taccino v. Allegany Cty.*, No. 09-2921, 2010 WL 3191161, at *5 (D. Md. Aug 11, 2010).  Consequently, any damages that resulted from the Moyes parties' aiding and abetting Johnston and First United were "coextensive with the damages caused by" Johnston and First United.  *See Borchers v. DBL Liquidating Tr. (In re Drexel Burnham Lambert Grp., Inc.)*, 161 B.R. 902, 910 (S.D.N.Y. 1993); *Brewer & Pritchard, P.C. v. AMKO Res. Int'l, LLC*, No. 14-13-113, 2014 WL 3512836, at *4 n.6 (Tex. App. July 15, 2014).  Receiver cannot show, as a matter of law, that the Moyes parties' conduct injured the participant banks more than the participant banks were injured as a result of the underlying Ponzi scheme. Thus, the state court's damages calculation for the underlying Ponzi scheme "fully compensate[d] these victim[s]" for their loss.  (*See* Am. Compl., Ex. G at 47.)

Receiver's second argument with respect to damages on behalf of the participant banks is that the proper measure of damages is the outstanding principal owed, without any offsets based on interest payments received prior to the collapse of the scheme.  To support this claim, Receiver cites *American Bank of St. Paul v. TD Bank, N.A.*, No. 09-

2240, 2012 WL 729877, at *2 (D. Minn. 2012), where the Court used this method of calculating damages in a case regarding aiding and abetting a Ponzi scheme.

What Receiver neglects to explain about *American Bank* is that no prior court order set forth a conflicting measure of damages for the same victim banks. *See id.* In contrast, the state court fully litigated the issue of how damages should be calculated for the participant banks damaged by this Ponzi scheme. *See Cmty. First Bank*, 822 N.W.2d at 311-13. After extensive briefing – where Receiver argued for the net-investment method – the state court approved the use of the net-investment method to calculate the participant banks' damages. Thus, instead of determining loss based on "the amount each bank was owed on the date that the receiver was appointed,"[22] the state court found damages would be calculated by "the amount a bank ha[d] invested, minus any funds it ha[d] recovered." *Id.* at 309. Consequently, said the state court, "[e]very dollar that First United had paid a bank [was] subtracted from the bank's principal investment." *Id.* Accordingly, the state court took the $133,924,747 in claims submitted by the participant banks, (Second Finn Decl. ¶ 18), subtracted "[e]very dollar that First United had paid" the participant banks, *Cmty. First Bank*, 822 N.W.2d at 309, and found the participant banks were damaged in the amount of $91,193,042 as a result of the Ponzi scheme, (Second Johnson Aff., Ex. 1 at 3). In calculating the damages in this way, the state court ensured no participant banks were rewarded by making "'legitimate' profits in the midst of a pervasive fraud." (*Id.*, Ex. 1 at 5.) Therefore, because the state court already

---

[22] This is the calculation Receiver now asks the Court to apply.

decided to use the net-investment method to calculate the participant banks' damages, the Court declines to apply a conflicting measure of damages.

Finally, Receiver asserts the Court should not limit damages regarding the claims asserted on behalf of the participant banks because this is a "jury question." But it is well established that the federal courts give "full faith and credit to state court judgments, giving them the same preclusive effect in federal court as they would have in state court." *Gopher Oil Co. v. Bunker*, 84 F.3d 1047, 1051-52 (8th Cir. 1996). Here, the state court assessed the amount of damages and determined the distribution of the damages for the participant banks. All Receiver's claims regarding calculation of the participant banks' damages, therefore, directly relate to the state court's decision about how to allocate damages under the net-investment method. (*See* Johnson Aff., Ex. 1 at 12 (noting that, at the time of briefing to the Minnesota Court of Appeals, Receiver had distributed to the participant banks only $31 million of the $91 million damages award)); *Cmty. First Bank*, 822 N.W.2d at 309 (discussing net-investment method).

Therefore, the record plainly shows that the issue of damages calculated in the state court is "identical" to the damages issue in this case with respect to the participant banks. For this reason, the Court finds that Receiver is precluded as a matter of law from litigating the issue of damages as to the participant banks.

Receiver separately argues that its claims brought on behalf of First United are not governed by the state court's order. To support its claim, Receiver notes that the state court order only decided the participant banks' damages, (Johnson Aff.., Ex. 1 at 12 (noting the final order and judgment related to "claims **against** First United and

Johnston" (emphasis added))), and that, as a Receiver, it is entitled to "initiate any legal proceeding deemed necessary to enforce . . . [a] payment obligation[], including but not limited to, collection proceedings including on any guarantees," (Finn Decl., Ex. C at 21). The Moyes parties' only response to Receiver's argument is that the Amended Complaint states that it was filed "to recover funds to compensate . . . the victims of Johnston's Ponzi scheme." (Am. Compl. ¶ 9.) But a plain reading of the Amended Complaint highlights that certain claims were brought on behalf of First United – not the participant banks. (*See id* ¶¶ 260-263, 276-77, 286.)

Because the state court order did not pertain to the damages of First United, (*see* Johnson Aff., Ex. 1 at 12), the question of damages available for Receiver's claims brought on behalf of First United is not barred by the doctrine of collateral estoppel. For this reason, the Court will deny the Moyes parties' motion asking the Court to find that Receiver is precluded as a matter of law from litigating the issue of damages as to claims brought specifically on behalf of First United.

This case will be placed on the Court's next available trial calendar.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.      Coolidge 600 Acquisition Co., LLC's Motion to Dismiss [Docket No. 128] is **GRANTED**.

2.     Receiver's Motion for Partial Summary Judgment [Docket No. 144] is **GRANTED in part** and **DENIED in part** as follows:

a.     The motion is **GRANTED** as to the **MJV-FUF4** guarantee in Count 8, but **DENIED** as to the MJV-FUF6 in Count 8;

b.     The motion is **DENIED** in all other respects.

3.     Defendants' Motion for Partial Summary Judgment [Docket No. 147] is **GRANTED in part** and **DENIED in part**:

a.     The motion is **GRANTED** as to:

(1)     aiding and abetting breach of fiduciary duty in Count 2;

(2)     the MJV-FUF6 guarantee in Count 8;

(3)     the unjust enrichment claim in Count 9;

(4)     collateral estoppel barring relitigation of damages for Counts 1-5 and 9;

b.     The motion is **DENIED** as to collateral estoppel barring litigation of damages for Counts 6-8.

DATED:  March 30, 2017                        _____s/ John R. Tunheim_____
at Minneapolis, Minnesota.                    JOHN R. TUNHEIM
                                              Chief Judge
                                              United States District Court